# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Criminal No. 07-152 (ESH)** |
| | : | |
| **ANTHONY MAURICE SUGGS,** *et al.*, | : | |
| **Defendants.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANTS'
## JOINT MOTION TO SUPPRESS WIRETAP EVIDENCE

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits the following opposition to defendants' Joint Motion to Suppress Wiretap Evidence filed November 16, 2007.  Defendants erroneously contend that the monitors conducting interceptions over defendant Suggs' cellular telephone did not properly minimize those interceptions.  Defendants, after conceding that there was probable cause set forth in Agent Pardee's affidavits, contends that there was no "necessity" for further surveillance after the initial thirty day period.  Defendants are mistaken in both contentions.  As grounds for its opposition the government cites the following points and authorities and such other points and authorities as may be cited at any hearing on this matter.

*Facts*

1.    The Indictment in this matter charges the defendants in several counts, with conspiracy to distribute and possess with intent to distribute phencyclidine and certain substantive counts of activity in furtherance of and in relation to that conspiracy in violation of 21 United States Code, sections 846, 844, 841(a)(1), 841(b)(1)(A)(iv) and 841(b)(1)(C), and 18 United States Code,

section 922(g)(1), and seeks the forfeiture of assets derived from the criminal conspiracies charged in the Indictment.[1]   The five remaining defendants are charged as co-conspirators in Count One, with possession with intent to distribute one kilogram or more of phencyclidine, in violation of Title 21, United States Code, Section 846.  The Indictment charges that the conspiracy opened on or about August 1, 2005, the exact date being unknown, and continuing thereafter up to and including at least June 12, 2007, in the District of Columbia, the District of Maryland, the Eastern District of New York, the Southern District of New York, the Southern District of Florida, the Northern District of Georgia, the Eastern District of Missouri, the Central District of California, and elsewhere.

      2.      The greatest part of the government's evidence in this matter is the result of electronic surveillance conducted in the District of Columbia pursuant to Title 18 United States Code, section 2510, *et seq*., authorized by the Honorable Rosemary M. Collyer of this Court.   Electronic surveillance conducted pursuant to eleven court orders signed by Judge Collyer[2] resulted in the interception of 26,444 separate activations and 21,183 completed calls.[3]  An "activation" is a term

---

[1]  The Indictment in this matter is related to the Indictment in *United States v. Glover, et al.,* Criminal No. 07-153 (ESH), in that both indictments arise from the same investigation and the same series of court authorized interceptions of wire and oral communications.

[2]  Judge Collyer signed Orders on January 9, 2007 (SUGGS' cellular telephone), February 7, 2007 (extension on SUGGS' cellular telephone), February 9, 2007 (GLOVER's cellular telephone), March 9, 2007 (extension on SUGGS' and GLOVER's cellular telephones), March 19, 2007 (GLOVER's truck), April 5, 2007 (extension on GLOVER's cellular telephone), April 19, 2007 (extension on GLOVER's truck),  April 30, 2007 (WILLIAMS' cellular telephones), May 4, 2007 (extension on GLOVER's cellular telephone), May 18, 2007 (extension on GLOVER's truck), and June 2, 2007 (extension on GLOVER's cellular telephone).

[3]  These totals include interceptions pursuant to Judge Collyer's authorization to monitor conversations in and within the vicinity of Mr. Glover's truck.  In that case interceptions were accomplished by way of the installation of a hidden cellular telephone which when activated

of art in electronic surveillance which means that the target telephone has been turned on, that is with regard to a cellular telephone, that the send button or its equivalent has been pushed. While every activation does not result in a conversation, the large majority of activations result in an interception of either a conversation, a voicemail message or, while the telephone is activated and acting as a microphone, the interception of a background conversation. When a conversation, a voicemail message or, while the telephone is activated and acting as a microphone, the interception of a background conversation occurs, the result is a completed call. In other words, a completed call is one in which monitoring results in the seizure of a communication[4].

3.      While Judge Collyer was considering the government's application to conduct electronic surveillance over defendant Suggs' cellular telephone the Assistant United States Attorneys (AUSA) supervising the conduct of surveillance drafted a memorandum to all monitors outlining the procedures for monitoring pursuant to Judge Collyer's order. *See* Attachment A hereto, General Operating Procedures For Interception Of Wire Communications To and From Cellular Telephone(240) 988-7588. All monitors were required to read that memorandum before "sitting on the wire." Despite the fact that the vast majority of monitors having previously monitored electronic surveillance and were thus very familiar with the standard procedures, all monitors were required to attend a "minimization conference," that is, a session lasting approximately an hour in which the

permitted the FBI to monitor conversations in and within the vicinity of Mr. Glover's truck. Thus, every activation of that cellular telephone of necessity involved a completed call and intercepted communication. There were 833 activations in the truck and 833 completed calls.

[4] An uncompleted call is one in which no communication is intercepted. These include hang-ups, calls partially dialed, or calls otherwise not resulting in communication.

Assistants discussed the procedures for minimization in this wiretap. If monitors could not attend the first such session they were required to attend an individual minimization session with one of the two AUSAs supervising the wire. All monitors were also required to read Agent Pardee's affidavit and Judge Collyer's order authorizing interceptions over Mr. Suggs' cellular telephone before sitting. A notebook was maintained in the monitoring room containing the operating memorandum, the affidavit and Judge Collyer's order and before monitoring all personnel were required to certify that they had read the designated documents. As monitoring went forward the AUSAs and the case agents maintained posted notices in the monitoring room identifying those subjects for whom monitoring had developed a pattern of innocence or a pattern of involvement as well as the telephone numbers associated with those persons.

4.    Judge Collyer's order required that during the course of monitoring communications over Suggs' cellular telephone, and indeed over course of monitoring of all the telephones and Mr. Glover's truck, that every 15 days[5] the supervising AUSAs must file a periodic report with the Judge Collyer reporting on progress and compliance with the Court's orders. These reports were filed and indeed, when the reports indicated that the hoped for results were not forthcoming on Ms. Williams' telephones the Court terminated interceptions over those lines, in the case of one telephone, before the thirty day authorization had expired.

---

[5]  In other words on the 15th and 30th day of monitoring over a particular telephone or in Mr. Glover's truck, the government had an obligation to report to the Court. Typically when the government filed an application to extend, the Court accepted the accompanying affidavit as fulfilling the obligation for the report on the 30th day.

4

5.

6.      On April 5, 2007, Mr. Suggs placed a telephone call to the law offices of Mr. Ellis and that call was minimized.  Shortly thereafter that same day, the same monitor intercepted an incoming call to Suggs in which Mr. Ellis called directly, without the aid of his staff or any formal announcement of his status as an attorney.  The same monitor, not recognizing that the call was from an attorney, did not minimize this second call.  In reviewing the calls after the fact, having reviewed the first call and proceeding to the second call one of the case agents recognized the number from the first call as being an attorney's office.  The case agent consulted with one of the supervising AUSAs and it was determined to seal the call after the fact and permit no more review or reference to the call.  Additionally, the case agent and the AUSA relieved the monitor of his responsibilities and directed that the monitor not monitor any more interceptions.  Finally, all monitors were reminded of their obligations regarding attorney-client communications and their responsibility to remain alert to the origin and content of calls, even if their is no staff involved to identify the attorney who is called or is calling.

7.      In the course of monitoring the five cellular telephones and communications in and within the vicinity of Mr. Glover's truck, monitors minimized 4001 completed calls or 18.9 % of all completed calls.  If we limit our analysis to defendant Suggs' cellular telephone, telephone number 240-988-7588, we find that monitors minimized 662 of 4849 completed calls or 13.65 %.  It is significant to note that of 6478 calls intercepted in this surveillance 6162 were of a duration of less than five minutes, 5893 of those calls were of a duration of less than three minutes, and 4426 were of a duration of less than one minute.

8.      In paragraph 32 of their motion the defendants provide a chart which they use to analyze the monitors performance over the course of interceptions over Mr. Suggs' cellular telephone. We confess that while we understand their intention and have implicit faith in the sincerity of their effort, we have no clue as to where they found their numbers.  Moreover, in concluding that their ratio somehow illuminates the situation and aids the Court in its obligation to make an objective assessment of the performance of minimization in light of the facts and circumstances confronting the monitors at the time of monitoring, is to ignore the clear holdings and advice of numerous courts, including the Supreme Court.  Such a ratio focuses on only one variable, time, and ignores all other factors which present themselves in this and virtually every other electronic surveillance.  Notwithstanding the fundamental irrelevance of such analysis, below please find the corrected counts of calls (the number presented by defendants are in parentheses, followed by the correction in bold type).

| Session Increments | Non-pertinent, Non-minimized Calls | Non-pertinent, Minimized Calls | Ratio | Pertinent Calls |
|---|---|---|---|---|
| 1 - 999 | (29) **822** | (41) **62** | (1 : 1.4) | (15) **115** |
| 1000 - 1999 | (23) **836** | (59) **99** | (1 : 2.6) | (18) **63** |
| 2000 - 2999 | (30) **856** | (60) **99** | (1 : 2.0) | (25) **45** |
| 3000 - 3999 | (39) **853** | (60) **126** | (1 : 1.5) | (8) **21** |
| 4000 - 4999 | (31) **801** | (58) **136** | (1 : 1.9) | (1) **63** |
| 5000 - 5999 | (28) **888** | (40) **71** | (1 : 1.4) | (6) **41** |
| 6000 - End | (17) **414** | (18) **41** | (1 : 1.1) | (0) **23** |

9.     Additionally, in an attachment to their pleading defendants present "a <u>sample</u> of such calls which he claims should have been minimized.  In Attachment B to this opposition we provide the background to place those calls in the context which the law makes vital to this Court's objective assessment of the performance of minimization in light of the facts and circumstances confronting the monitors at the time of monitoring.

*Argument*

## I.  MINIMIZATION

**A.  The General Standard**

10.     Pursuant to 18 United States Code, § 2518(5), a wiretap must "minimize interception of communications not otherwise subject to interception [Chapter 119 of the United States Code,] and must terminate upon attainment of the authorized objective."  18 United States Code, § 2518(5) (2006).  Simply put, minimization means that the agents should only listen to criminal conversations, and should turn off the interception devices when the subjects engage in non-criminal conversations. But as is common when we attempt to simplify, the practice of determining what constitutes a criminal conversation in an ongoing electronic surveillance and when to terminate monitoring is decidedly more difficult and has generated a substantial body of law.  Defendants in their analysis of minimization in the electronic surveillance which resulted in their indictment simplify that process to serve their own purposes.  The difficulty in minimization arises because agents must listen to conversations in order to determine whether they are criminal.  How much of a conversation can government agents listen to while complying with the statute's mandate "to minimize the interception of communications not otherwise subject to interception under this chapter, . . ."?  18

United States Code, § 2518(5).   The Supreme Court addressed this question and the process of minimization in *Scott v. United States*, 436 U.S. 128 (1978).

12.     In *Scott*, a case which originated early in the history of statutorily authorized wiretapping, the Supreme Court reviewed a holding of our Circuit Court, *United States v. Scott*, 551 F.2d 467 (D.C.Cir. 1977).   The *Scott* case has a somewhat unusual history in the courts below. Following their indictment defendants moved to suppress the fruits of the wiretap which lead to their prosecution.   The District Court granted the motion finding that the agents had failed to comply with the minimization requirement contained in the wiretap order and ordered suppression of the intercepted conversations and all derivative evidence.   In this wiretap agents intercepted almost all the activations but only 40% of those activations were shown to be narcotics related.   This, the court reasoned, "strongly indicate[d] the indiscriminate use of wire surveillance that was proscribed by *Katz* and *Berger*." *United States v. Scott,* 331 F.Supp. 233 247 (D.D.C. 1971).   Our Court of Appeals reversed, concluding that an assessment of the reasonableness of the efforts at minimization first requires an evaluation of the reasonableness of the actual interceptions in light of the purpose of the wiretap and the totality of the circumstances before any inquiry is made into the subjective intent of the agents conducting the surveillance.   *United States v. Scott,* 504 F.2d. 194 (D.C. Cir.1974).   Upon remand the District Court again suppressed and once again the Court of Appeals reversed holding that "the decision on the suppression motion must ultimately be based on the reasonableness of the actual interceptions and not on whether the agents subjectively intended to minimize their interceptions." *United States v. Scott,* 516 F.2d. 751, 756 (D.C. Cir.1975).   Due to the significant passage of time the Court of Appeals conducted the necessary review itself and ruled the wiretap conversations admissible.   Defendants were convicted on remand and those convictions

9

were affirmed by the Court of Appeals. *United States v. Scott,* 551 F.2d. 467 (D.C. Cir.1977).

13.    In *Scott*, the Supreme Court required that in reviewing the performance of law enforcement in conducting "minimization" courts must assess the objective conduct of the monitors conducting surveillance, rather than their subjective intent or motives. *See Scott v. United States, supra,* 436 U.S. at 138-39 (where the Court found surveillance to be reasonable based on the conversations that were recorded, despite the agents' lack of motive to actually minimize interception). Furthermore, the Court held that § 2518(5) does not "forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of [non-pertinent] conversations." Id. at 140. Before a court can find that the government failed to comply with the minimization requirement, the defendant must show that "some conversation was intercepted which clearly would not have been intercepted had reasonable attempts at minimization been made." *United States v. Scott*, 516 F.2d 751, 757 (D.C. Cir. 1975), *aff'd,* 436 U.S. 128. Therefore, courts must determine whether reasonable attempts at minimization were made when deciding whether § 2518(5) was violated.

14.    In determining reasonable conduct, "blind reliance on the percentage of non-pertinent calls intercepted is not a sure guide to the correct answer." *Scott v. United States, supra*, 436 U.S. at 140. There will be some cases where a high percentage of non-pertinent calls will be intercepted, yet, interception will still be deemed as reasonable. *Id.* "Because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case." Id. at 139. Whether the agents were in fact conducting surveillance in a reasonable manner will "depend on the facts and circumstances of each case." Id. at 140. The courts have applied a case-by-case basis in determining compliance with the minimization requirement. *United*

10

*States v. Clerkley*, 556 F.2d 709, 716 (4th Cir. 1977). The minimization requirement is usually satisfied if, on the whole, "the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." *United States v. Oriakhi*, 47 F.3d 1290, 1300 (4th Cir. 1995); *see also United States v. Feldman*, 606 F.2d 673, 678 (6th Cir. 1979) (holding the same).

**B.  The Standard Applied to Circumstantial Factors**

15.    Because there is no inflexible rule to determine reasonableness, many circumstantial factors must be considered. In *Scott*, the Supreme Court alluded to several factors, including the number of short calls intercepted, whether the surveillance target is part of a widespread conspiracy, what type of telephone line is being monitored, at what point in the investigation the interception took place, and whether the conversation being intercepted is ambiguous. *See Scott v. United States, supra*, 436 U.S. at 140-42 (where the Court held reasonable the interception of a target involved in a large drug conspiracy because many of the intercepted non-pertinent conversations were short in nature, ambiguous, or first-time conversations).

16.    Following *Scott*, the circuit courts have made further determinations on what constitutes reasonable minimization given the numerous circumstantial factors. Some circuits have derived test to determine the reasonableness of a government's minimization efforts. The Fifth Circuit uses a three part test considering (1) the nature and scope of the criminal enterprise under investigation, (2) the government's reasonable inferences of the character of a conversation from the parties to it; and (3) the extent of judicial supervision. *United States v. Brown*, 303 F.3d 583, 604 (5th Cir. 2002). Similarly, the First Circuit also held that it will look at several factors, including (1) the nature and complexity of the suspected criminals, (2) the thoroughness of the government's

precautions to bring about minimization; and (3) the degree of judicial supervision over the surveillance process. *United States v. Lopez*, 300 F.3d 46, 57 (1st Cir. 2002). These factors, and some others, are discussed in more detail below.

*Percentage Of Non-pertinent Calls Intercepted*

17.    Although percentages of non-pertinent calls intercepted can provide assistance, blind reliance on this percentage is not a sure guide. *Scott v. United States, supra*, 436 U.S. at 140. Other factors to consider are what percentage of those calls are very short, if they are one-time only calls, and whether they may be ambiguous with coded language. *See Id.* at 139-42. Therefore, "even a relatively high percentage of non-pertinent calls is an inaccurate indicator of whether or not the government complied with the minimization requirement." *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992); *see also United States v. Anderson*, 39 F.3d 331, 342 (D.C. Cir. 1994) (noting that only 10% of calls being minimized proves nothing on its own).

*When Conversations Are Short*

18.    The Supreme Court indicated that "it may not be unreasonable to intercept almost every short conversation because the determination of relevancy cannot be made before the call is completed." *Scott v. United States, supra*, 436 U.S. at 141. *See also United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002) (holding that minimization of short calls is not required); *United States v. Capra*, 501 F.2d 267, 275-76 (2d Cir. 1974) (holding that calls lasting less than two minutes need not be minimized); *United States v. Apodaca*, 820 F.2d 348, 350 (10th Cir. 1987); and *United States v. Macklin*, 902 F.2d 1320, 1328 (8th Cir. 1990) (holding similarly).

19.    In this regard *Scott* and its progeny such as *Capra, Apodaca* and *Macklin*, reference several practical determinations a monitor must weigh in making a decision to minimize. First, both parties to a conversation must be identified before the monitor can assess whether the conversation is likely to include criminal matter. Where, as here, the telephone is a cellular telephone being principally used if not solely, by a target in the ongoing investigation, the monitor is logically compelled to listen more closely and for longer periods since the target's central role in the matter under investigation makes it that much more likely that any conversation is or will become criminal in nature. Similarly, the identity of the other party to the targets conversation is a crucial factor in a determination to minimize. If and when the second party is determined to be a target or criminal associate of the target telephone's user, in short, a co-conspirator, the monitor will be faced with a situation where both parties to the interception have been determined to display a pattern of involvement, and again, the monitor is logically compelled to listen even more closely and for even longer periods since the targets' roles in the matter under investigation make it that much more likely that any conversation is or will become criminal in nature. Finally in this regard, the courts have recognized that in the context of an entire conversation the criminal aspect of that conversation, even if it was the sole purpose for initiating the conversation, is ephemeral at best. It is firmly within common experience that even in the a conversation between parties who enjoy limited daily interaction, a telephone conversation will begin and end with an exchange of pleasantries of undetermined length before the initiating party introduces the purpose for his call. In the same vein, monitors are aware and the courts recognize that in certain conspiracies such as the narcotics conspiracy herein, the "business" portion of the telephone conversation can be brief, abruptly begun and ended. For these and similar practical factors inherent in responsible monitoring in a court

13

authorized electronic surveillance, the standards in *Scott*, *Capra, Apodaca* and *Macklin*, recognize that in all matters impacting the Fourth Amendment, even those governed in the first instance by 18 United States Code, § 2510, *et seq.*, government action and a court's review must be grounded in what is reasonable under the circumstances presented.

*When Targets Are Part Of A Large Conspiracy*

20.     When the investigation involves "what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott v. United States, supra,* 436 U.S. at 140. In these cases, even a "seasoned listener would [be] hard pressed to determine with any precision the relevancy of many of the calls before they were completed." Id. at 142. When an investigation involves a drug ring of unknown proportion, "the need to allow latitude to eavesdroppers is close to its zenith." *United States v. Charles*, 213 F.2d 10, 22 (1st Cir. 2000) (citing *United States v. Hoffman*, 832 F.2d 1299, 1308 (1st Cir. 1987)). Compared to a single criminal episode, "large and sophisticated narcotics conspiracies may justify considerably more interception." *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975); *see also Clerkley, supra*, 556 F.2d at 717 (giving the same leeway for gambling rings, not just drug rings).

21.     Allowing leeway is "especially important when purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped." *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1989) (citing *Quintana, supra*, 508 F.2d at 874); *see also United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir. 1994) (where court acknowledged that one of the goals of interception was determining the means, manners, and people involved in a conspiracy).

14

22.    In addition, while one court has held that "once a pattern of innocent calls develops … those monitoring have a duty to terminate their recordings of such calls," *United States v. Abascal*, 564 F.2d 821, 827 (9th Cir. 1977), other courts have been more tolerant of excessive surveillance involving the use of wire taps in large scale conspiracy cases. *See United States v. Fregoso*, 60 F.3d 1314, 1322 (8th Cir. 1995) (ruling against the defendant's argument that the government should not have monitored calls during a certain time of day when a pattern of innocent calls developed).

*When Conversation Involves Guarded Or Coded Language*

23.    The Supreme Court indicated that when a large number of calls are ambiguous in nature, making characterization of the call virtually impossible, "their interception cannot be viewed as a violation of the minimization requirement." *Scott v. United States, supra*, 436 U.S. at 142. Agents cannot be expected to know if these ambiguous calls, including those with guarded or coded language, are not pertinent prior to their termination. *Id.* at 140. Because conspiracies frequently utilize "codes and specialized jargon, making criminal conversations more difficult to detect and decipher, there is yet [another] reason for affording investigators some leeway." *United States v. Uribe,* 890 F.2d 554, 557 (1st Cir. 1989) (finding that the agents may monitor the phones almost continuously given the nature of the criminal activities and jargon); *see also United States v. Sanchez*, 961 F.2d 1169, 1179 (5th Cir. 1992) (holding that when drug jargon is used over the phone, the government may engage in more extensive wiretapping and the interception of innocent calls may be more reasonable); and  *United States v. Daly, supra*, 535 F.2d at 441 (allowing greater monitoring when co-conspirators use specialized jargon).

15

24.    The effect of such coded language and veiled references on the minimization process represents yet another critical factor defendants have ignored in assessing the reasonableness of a monitor's actions in determining when and if to minimize a conversation.  Where, as here, defendants use coded references to the narcotics and their illegal activity involving narcotics, monitors must assess the context in which a suspected or possible coded reference is heard.  Thus, when in a conversation at 6:49 p.m. on January 18, 2007, Price told Suggs he was "looking at halftime," and said "it might be the same as last time," it is only in the context of their discussion about a meeting two days earlier  that a monitor can understand that "halftime" and "same as last time" are references to drug quantities.  Conversations of this character were the rule rather than the exception in all of the court authorized surveillances of telephones in this investigation requiring that monitors listen to most if not all of a conversation to accurately determine that the conversants were not in fact talking about what they appeared to be talking about.  Similarly, on January 10, 2007,  at 5:30 p.m., defendant Suggs and Julian Johnson had a coded conversation in which Johnson told Suggs that he was in town and Suggs could come through.  Suggs said that he was suppose to "take care of that," after rush hour and asked if Johnson wanted to talk to him first.  Johnson asked Suggs if was he "dead," meaning that Suggs did not have any drugs, and Suggs said yes.  Suggs then indicated that he did not know if Johnson wanted it "from the market."  Johnson responded "the same thing we did."  Johnson also stated that he wanted to go heavy, but "I ain't got no storage bin." This conversation is, taken in its entirety, clearly about drugs but any given coded portion must be heard in the context of the rest of the conversation to understand it is about drugs, particularly where as in this conversation the monitors do not have a history of such conversations involving Johnson, or for that matter Suggs at that point in time.

25.    On January 11, 2007, at 3:48 p.m., Suggs called Johnson and they agreed to meet at Johnson's mother's house.    At 4:22 p.m., Suggs called Johnson again and told him he was downstairs, but could not get inside.    Johnson instructed Suggs to dial 2-0-2.    During this investigation law enforcement has determined that Johnson's mother lives at 1440 V Street, N.W., Apartment 202, Washington, D.C.  At 7:16 p.m., Suggs received a call from Johnson  who asked if Suggs was "gonna slide back through," and said he thought Suggs had Johnson's "luggage" with him.  Suggs said he did not and agreed to meet with Johnson in thirty minutes.  At 8:32 p.m., Suggs called Johnson and asked if  Johnson wanted him to bring the 'hair dryer" he asked for earlier. Johnson said yes and Suggs indicated he would meet Johnson shortly.  This series of calls illustrates the some of the factors which face a monitor.  When Suggs told Johnson he was downstairs, it would be reasonable at first blush to suggest that this was innocent conversation but in truth, while only indirectly criminal this seemingly innocent conversation served one of the several purposes for which monitoring was authorized when it served to identify an address where Johnson conducted his illegal narcotics business.[6]  Likewise, Johnson's reference to "luggage" and later Suggs' reference to a "hair dryer" are seemingly innocent but taken together and given that Johnson never flinched when Suggs talked about hair dryers after Johnson had mentioned "luggage," it is clear that neither man was discussing luggage or hair dryers but in fact they both knew exactly what the other was talking about when he was talking about something other than what he was talking about.

*At What Point In The Investigation The Interception Occurs*

26.    It is important to determine at exactly what point during the authorized period the

---

[6]  On June 19, 2007, based in part on information from this seemingly innocent telephone call, the FBI executed a search warrant at 144 V Street, N.W., apartment 202, and recovered more than $20,000 in drug proceeds and a .38 caliber pistol.

interception was made because "during the early stages of surveillance the agents may be forced to intercept all calls to establish categories of non-pertinent calls which will not be intercepted thereafter." Scott, 436 U.S. at 141. However, "interception of those same types of calls might be unreasonable later on…once the non-pertinent categories have been established and it is clear that this particular conversation is of that type." *Id.; See also United States v. Dumes, supra*, 313 F.3d at 380.

*What Type Of Telephone Is Being Monitored*

27.    "The type of use to which the telephone is normally put may also have some bearing on the extent of minimization required." *Scott v. United States, supra*, 436 U.S. at 140 (comparing the difference between listening to every call from a public telephone, where a government would not be permitted to simply listen to every call, with a telephone located in the residence of a person thought to be the head of a major drug ring). In such circumstances there is a reasonable probability thaty communications over the target telephone will involve a target of the investigation. In *United States v. Figueroa*, 757 F.2d 466, 472-73 (2d Cir. 1985), the second Circuit approved continuously monitoring a public telephone in jail as opposed to a public telephone at a bus or train terminal reasoning that prisoners do not have the same expectation of privacy when they are warned that conversations may be monitored. In so holding the Second Circuit remarked

> *Scott* held that a violation of the minimization requirement contained in § 2518(5) "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time", [Citing *Scott v. United States*] 436 U.S. at 136, 98 S.Ct. at 1723, not merely on his subjective intent when he conducted the wiretap. The court further determined that, on the facts before it, the agents' conduct was reasonable and therefore did not violate either the statute or the fourth amendment. Notwithstanding the warning issued by Justice Brennan in dissent, we find nothing in *Scott* to persuade us

18

> that the minimization requirement has become so diluted as to render
> Title III unconstitutional on its face.

*United States v. Figueroa, supra*, 757 F.2d at 472.  The distinction in *Figueroa* turns on the conversant's reasonable expectation of privacy in a particular telephone.  Under circumstances where the conversant has a reasonable expectation of privacy, an objective assessment is required.  Given this standard when, as here, the monitored telephone is a cellular telephone used exclusively by Anthony Maurice Suggs, a principal target of this wiretap, monitors are very nearly certain that every activation on this surveillance will involve communication from or to a target of the investigation.[7]

*When Known Targets Are Involved In The Conversation*

28.    In laying out several factors that determine whether or not minimization was reasonable, the Fifth Circuit held that a court should consider, among other things, the "government's reasonable inferences of the character of a conversation from the parties to it." *United States v. Brown, supra*, 303 F.3d at 604.  However, when the target is part of a large conspiracy, the fact that neither a specific target or their crime is identified at the onset of the conversation does not negate a finding of reasonable minimization because one of the aims of the investigation can be to identify participants in the conspiracy.  *See United States v. Wilson*, 835 F.2d 1440, 1446 (D.C. Cir. 1987); *see also United States v. Hyde*, 574 F.2d 856, 869 (5th Cir. 1978) (acknowledging legitimate interest in identifying the conspirators).  Furthermore, the government can continue to monitor calls by their target that might be related to the suspected crime.  *See United States v. Oriakhi*, *supra*, 57 F.3d at 1300 (where the court found the government's minimization efforts reasonable when the target was talking to a family member about sending money to Nigeria

---

[7]  Because the target telephone was a cellular telephone, it was unusual for anyone other than Suggs to be intercepted making or receiving a call using Suggs' telephone.

19

even though the suspected crime was narcotics); *see also United States v. Garcia*, 232 F.3d 1309, 1316-17 (10th Cir. 2000) (holding that continued interception of calls concerning gang talk and assault was reasonable given its close connection to narcotics).

29.     In addition, even if no named targets are involved in a conversation, the government can proceed with reasonable monitoring when the conversation is criminal. *See United States v. Killingsworth*, 117, F.3d 1159, 1166 (10th Cir. 1997) (finding that the government acted reasonably when it intercepted a conversation concerning narcotics that did not involve any of the named targets from the original wiretap authorization).

*When The Conversation Is Between A Target And A Party Who Merits Privileged Communication*

30.     The fact that a known target is conversing with a doctor or lawyer, or other figure that warrants privileged communication, does not by itself require minimization.  Rather, the Fifth Circuit has held that it is acceptable to monitor, for a moment, a conversation involving doctors and lawyers to make sure the conversation is not criminal because such individuals are known to commit crimes as well. *Hyde*, 574 F.2d at 870 (finding the agents' conduct correct and reasonable when they listened to calls involving doctors and lawyers long enough to determine if they were part of the conspiracy).

31.     It is reasonable to conclude that more leeway will be given depending on how large of a conspiracy the agents are monitoring. *See Hoffman*, 832 F.2d 1307-08 (1st Cir. 1987); see also *United States v. Charles*, 213 F.3d 10, 22-23 (1st Cir. 2000) (where minimization was reasonable even though the government inadvertently intercepted a protected call between a lawyer and their client.  That conversation was not used at trial, other protected conversations with lawyers were minimized, and there was pervasive judicial supervision); and *United States v. Nersesian*, 824 F.2d

1294, 1307 (2d Cir. 1987) (where the court ruled minimization was reasonable despite the agents intercepting innocent conversations between husband and wife because the calls took place in the target residence, it involved a widespread conspiracy, and it utilized coded language).When Conversations Jumps Back And Forth Between Criminal and Non-Criminal Conversation

32.    Often, targets involved in a conversation will jump back and forth between criminal conversation and non-criminal conversation.  In order to address this matter, the "two minutes up/one minute down" minimization technique (where agents listen in for two minutes and cut out for a minute if the conversation is nonpertinent) recommended in the Department of Justice Manual has been approved.  *See United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir. 1995); *see also United States v. Mansoori*, 304 F.3d 635, 646-48 (7th Cir. 2002) (holding that periodic spot-checking is not unreasonable and having express limits on frequency and duration of spot-checks is impractical); and *United States v. Hull*, 456 F.3d 133, 135 (3d Cir. 2006) (finding that the agents reserve the right to spot-check any conversation to ensure that it does not turn criminal).

33.    Spot-checking is supported because a blanket rule that requires agents to cut off interception at a certain time of continued "innocent" conversation would create "a privileged sanctuary for illegal conversations." *Wilson*, 835 F.2d at 1446.  Furthermore, monitoring agents are "not gifted with prescience and cannot be expected to know in advance what direction the conversation will take." *United States v. Cox*, 162 F.2d 1293, 1301 (8th Cir. 1972).

*The Extent Of Judicial Supervision*

34.    It is well established that courts are more likely to approve of a government's investigative efforts when there is prevalent judicial supervision over the surveillance. *Feldman,* 606 F.2d at 678 (6th Cir. 1979); *see also United States v. Williams*, 109 F.3d 502, 507 (8th Cir. 1997)

(holding that among other things, the court is to consider the extent of judicial supervision. Here, the court found minimization reasonable when surveillance reports were given to the judge every ten days); and *United States v. Eiland*, 398 F. Supp. 2d 160, 175 (D.D.C. 2005) (where the government's actions were reasonable when they kept logs of every call during the wiretap period, provided it to the defendants, and were regularly reviewed by a judge).

35.    In conclusion, the Supreme Court and the circuit courts have laid out several guidelines on what constitutes a reasonable government effort to minimize non-pertinent calls. This includes the factors concerning the targets, such as the size of the conspiracy, which phones are tapped, and whether targets are involved in the conversations; factors concerning the actual conversations intercepted, such as its length and whether it utilizes coded or guarded language; and factors focusing on the government's action, such as the extent of judicial approval they seek throughout their investigation. Reasonableness, after all, is not a constant; "as Emerson said of nature, reasonableness 'is a mutable cloud, which is always and never the same.'" *Sierra Club v. Secretary of the Army*, 820 F.2d 513, 517 (1st Cir. 1987). We submit that it is pre-eminently clear that the monitors in this case made every reasonable attempt to minimize the interceptions in this matter in compliance with the Judge Collyer's orders and the dictates of the law. The monitors performance in minimization will not serve as a basis for suppression in this matter.

## II.  NECESSITY

*In Extending the Title Iii Wiretap on Defendant Sugg's*
*Telephone Line, the Court Properly Found "Necessity"*

36.    During the course of this investigation, the government obtained a court-authorized wiretap on defendant Anthony Sugg's telephone (240-988-7588).  The original wiretap order was signed on January 8, 2007, for a thirty-day period.  The government obtained a thirty-day extensions to this wiretap on February 7, 2007, and a second thirty-day extension on March 9, 2007.

37.    Defendants argues that the Court improperly authorized the extensions to the wiretap on Anthony Sugg's telephone line because there was no "necessity" in extending the wiretap beyond the original thirty-day period.  Defendants' Mot. ¶14.  Specifically, defendants claim that the "major purposes of the wiretap" were accomplished in the original thirty-day period because the government had determined that: Lonnell Glover was Sugg's supplier of PCP; there was no other source of cocaine other than Julian Johnson's source in Texas; Helery Price was a customer of Suggs; and no new customer of Suggs had been identified after the original application.  Defendants' Mot. ¶15.  Defendant also argues that there was no "necessity" in extending the wiretap because the investigation could have continued through other means.  Defendants' Mot. ¶21.  Accordingly, defendants argue that the Court should have denied the extensions to the wiretap.

38.    Defendants' arguments are without merit.  The Court authorized the original wiretap, and the two extensions, because it properly found that: "(1) probable cause exists to believe that an individual has committed or is about to commit one of certain enumerated offenses; (2) probable cause exists to believe that particular communications concerning that offense will be obtained through an interception; (3) normal investigative procedures have been tried and have failed or

23

reasonably appear to be unlikely to succeed if tried; and (4) probable cause exists to believe that the communication sought to be wiretapped is being used, or is about to be used, in connection with the commission of the offense." *United States v. Carter*, 449 F.3d 1287, 1292 (D.C. Cir. 2006)(internal quotations and brackets omitted); *United States v. Jones*, 451 F.Supp.2d 71, 80 (D.D.C. 2006)(Huvelle, J.). Here, defendants do not contest the required "probable cause" findings based on the three affidavits (original and two extension affidavits). Defendants' Mot.¶13. Rather, defendants challenge the extensions based solely on the "necessity" element.

39.    <u>First</u>, the extensions to the original wiretap were necessary because the objectives of the authorization had not yet been "fully" achieved. The wiretap statute provides that an order authorizing an interception cannot extend "for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518(5); *United States v. Carter, supra*, 449 F.3d at 1292. In this case, while the government learned of several important aspects of Sugg's narcotics operation during the initial thirty-days of the wiretap (*e.g.*, that Lonnell Glover was Sugg's supplier of PCP), there remained much more to uncover in building a case against Suggs and his co-conspirators.

40.    Indeed, Judge Collyer's Orders specifically authorized the government to continue monitoring the wiretap on Sugg's telephone even after some useful information had been intercepted. The Orders state:

> that such interceptions shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal <u>fully</u> the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal <u>fully</u> the identities of their confederates, <u>their places of operation</u>, and the nature of the conspiracy involved therein. . . .

(emphasis added).  In *United States v. Jones, supra*, 451 F.Supp. at 83, this Court similarly held that the government may continue to use the wiretap even after some evidence had been obtained linking the defendant to a crime because "[t]he necessity requirement is not meant to work as an impediment to making a good case better, or a strong case airtight."

41.    For example, the government sought the extensions to the wiretap because it had not yet identified the location(s) where defendant Suggs stored his drugs, an important part of his operation and a fruitful place from which to recover compelling physical evidence.  Although defendants argue that "[i]t is difficult to see how the wiretap would provide much help in this regard," (Defendants' Mot. ¶24), the wiretap extensions produced exactly this result.  On March 27, 2007, during the second extension of the wiretap, the government learned through the wiretap that defendant Suggs used his girlfriend/co-conspirator's residence at 4000 10th Street, N.W., to store his supply of PCP.  Specifically, at 6:28 p.m., the government intercepted a conversation in which Ngozi Joy informed defendant Suggs that, "I could smell that stuff when I pulled up - when I got out of the car" and that a police officer rode by the house on a bicycle.  Joy also stated that, "I knew what it was when I walked up."   This wiretap interception ultimately led law enforcement officers to obtain a search warrant at that location and to recover approximately 2 ½ gallons of PCP, rubber glovers, masks, funnels, and $7000 in cash.  Officers at the scene overheard defendant Suggs tell defendant Joy, "it's mine, I'll take my weight."  In addition, on March 28, 2007, law enforcement intercepted a phone call in which defendant Suggs and defendant Joy discussed the drugs found in her home, and defendant Suggs declared, "I'm taking the motherfuckin beef."  (Meaning that Suggs will take

responsibility for the 2 ½ gallons of PCP found in defendant Joy's residence). This information and evidence would not have been possible without the extensions to the wiretap.[8]

42.    Second, the extensions were properly authorized even though other investigative means might have been available. The "necessity requirement" – that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c) – is the "keystone of congressional regulation of electronic eavesdropping." *United States v. Carter, supra*, 449 F.3d at 1292. However, "the statute does not require the literal exhaustion of all other possible investigative approaches. Instead, in a case involving a wide-ranging conspiracy, the government must simply provide an adequate basis for the court to make a practical, common sense determination that other methods would likely prove inadequate to reveal the operation's 'full nature and scope.'" *United States v.Jones, supra*, 451 F.Supp. at 81-82. In the original wiretap order and the two extensions, the Court found that this requirement had been met.

43.    Defendants argue that the extensions should have been denied because the government could have employed other investigative techniques such as: surveillance, tracking devices, and cell site information to determine locations of criminal activity (Defendants' Mot.¶25); and  bank records and other financial transactions to determine the methods of money laundering (Defendants' Mot.¶27). However, because the "necessity requirement" is NOT an "exhaustion requirement," defendants' argument is unavailing. In Carter, 449 F.3d at 1294, the Court made clear

---

[8] In addition, the government applied for the extensions to the wiretap because other important aspects of defendant Sugg's operation had not yet been revealed, including: the methods of laundering or investing the proceeds of the illegal drug sales.

that "no authority indicates that the government must cease to request wiretaps as soon as it becomes clear that another technique, such as a search warrant, may prove useful in a limited way. The necessity requirement was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." (Internal quotations omitted). Such individual investigative techniques might be productive in a discrete way, but they would fail to reveal the "full nature and scope" of the conspiracy. *Id*. As the Court found in approving the original wiretap and the two extensions, the wiretap was "necessary" to accomplish that end.

44.     In sum, the Court properly found "necessity" in authorizing the two extensions to the wiretap.

**WHEREFORE**, we respectfully submit that the defendants' Joint Motion to Suppress Wiretap Evidence should be denied.

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY


_____
WILLIAM J. O'MALLEY, JR.
Assistant United States Attorney


_____
ANTHONY SCARPELLI
Assistant United States Attorney


_____
JOHN K. HAN
Assistant United States Attorney

*Certificate of Service*

    **I HEREBY** certify that I have caused a copy of the foregoing government's opposition to defendants' Joint Motion to Suppress Wiretap Evidence, Attachments thereto and proposed Order to be served by mail upon counsel, for defendants as listed below; this 28th day of November, 2007.

_____

WILLIAM J. O'MALLEY, JR.
Assistant United States Attorney
D. C. Bar No. 166-991
555 4th Street, N.W., Fourth Floor
Washington, D.C.  20001
(202) 305-1749

**Anthony Maurice Suggs**
Patrick Donahue, Esquire
18 West Street
Annapolis, MD   21401

**James Lawrence Parker**
James W. Rudasill, Jr.
601 Indiana Avenue, N.W. #500
Washington, D.C. 20004

**Ernest Milton Glover**
Anthony Martin, Esquire
7841 Belle Point Drive
Greenbelt, Maryland, 20770

**Glendale Earl Lee**
Frederick Jones
5901 Montrose Rd.,
Apt. 1009 North
Rockville, Maryland 20852

**Helery Price**
Richard K. Gilbert
601 Pennsylvania Avenue, N.W.
Suite 900, South Bldg.
Washington, D.C. 20001

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 07-152 (ESH)** |
| | : | |
| **ANTHONY MAURICE SUGGS,** *et al.,* | : | |
| **Defendants.** | : | |

## ORDER

Upon the defendants' Joint Motion to Suppress Wiretap Evidence and after a review of the government's opposition thereto and the entire record in this matter, it is this _____ day of December, 2007,

**ORDERED** that defendants' motion be, and hereby is, denied.

_____
ELLEN SEGAL HUVELLE
United States District Judge

Copies to:

William J. O'Malley, Jr.
Anthony Scarpelli
John K. Han
Assistant United States Attorneys

**Anthony Maurice Suggs**
Patrick Donahue, Esquire
18 West Street
Annapolis, MD   21401

**James Lawrence Parker**
James W. Rudasill, Jr.
601 Indiana Avenue, N.W. #500
Washington, D.C. 20004

**Ernest Milton Glover**
Anthony Martin, Esquire
7841 Belle Point Drive
Greenbelt, Maryland, 20770

**Glendale Earl Lee**
Frederick Jones
5901 Montrose Rd.,
Apt. 1009 North
Rockville, Maryland 20852

**Helery Price**
Richard K. Gilbert
601 Pennsylvania Avenue, N.W.
Suite 900, South Bldg.
Washington, D.C. 20001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No. 07-152 (ESH) |
| | : | |
| ANTHONY MAURICE SUGGS, *et al.*, | : | |
| Defendants. | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANTS'
JOINT MOTION TO SUPPRESS WIRETAP EVIDENCE

_____ATTACHMENT A

# Memorandum

*United States Attorney*
*District of Columbia*



| Subject: | | Date: |
|---|---|---|
| General Operating Procedures For Interception Of Wire Communications To and From Cellular Telephone(240) 988-7588 | | January 9, 2007 |

| To: | From: |
|---|---|
| Selected FBI Agents, Selected MPD Investigators, Other Sworn Federal Officers, Other Government Personnel and Assistant United States Attorney Contract Employees Under the Supervision of Investigative and Law Enforcement Officers | Anthony Scarpelli Assistant United States Attorney<br><br>William J. O'Malley, Jr. Assistant United States Attorney |

:

On January 8, 2007, an application and order were presented to the Honorable Rosemary M. Collyer of the United States District Judge for the District of Columbia, who authorized the interception of wire communications over the cellular telephone assigned (240) 988-7588. The telephone number is subscribed to by Irving York, 13701 Foal Court, Upper Marlboro, Maryland 20772. This memorandum sets forth certain procedures which must be followed by each person participating in the interception of the wire communications.

The existence of this wiretap should remain confidential and not be disclosed to any other federal or state officers or anyone not involved with the actual monitoring of the wiretap, other than those with a need to know for purposes of assisting with the investigation. Before making any disclosure of the wiretap or any information obtained from the wiretap to any other federal or state officers or anyone not involved with the actual monitoring of the wiretap, to officers or agents we believe have with a need to know for purposes of assisting with this or some other investigation, personnel should consult the supervising Assistant United States Attorneys.

Before an agent, or sworn federal officer begins to monitor the wire interceptions,  he or

she must: (I) attend a minimization conference or speak directly with Anthony Scarpelli or William J. O'Malley, Jr., regarding minimization; (ii) carefully read this memorandum; and (iii) fully review the Court order authorizing the wire interception, as well as the affidavit of Special Agent Ryan Pardee filed in support of the government's application; and (iv) sign an acknowledgment that you have read these instructions as well as the Court Order and Agent Pardee's affidavit and attended a minimization session with either of the supervising AUSAs. A copy of all pertinent Court documents (Application, Affidavit, Orders) will be maintained at the monitoring room for review prior to monitoring and for reference during monitoring.

## I. SCOPE OF AUTHORIZATION

The Court's order authorizes the monitoring, interception and recording of the wire communications of ANTHONY MAURICE SUGGS, also known as "APPLEJACK," JULIAN JOHNSON, also known as "JUJU,"JAMES LAWRENCE PARKER, also known as "YOGI," DESALINES CARROLL BATTLE, also known as "DEZZIE," MAURICE JERMAINE WILLIAMS, also known as "MO," ERNEST MILTON GLOVER, also known as "FISH," GLENDALE EARL LEE, also known as "GLEN," and others as yet unknown or not yet fully identified (hereinafter "targets"), concerning offenses enumerated in Section 2516 of Title 18, United States Code, that is, offenses involving: (I) possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. Section 841(a)(1); (ii) conspiracy to commit such offenses, in violation of 21 U.S.C. Section 846; (iii) use of communications facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 U.S.C. Section 843(b); and (iv) money laundering, in violation of 18 U.S.C. Sections 1956 and 1957.

You may, however, also encounter communications which constitute evidence of other criminal offenses. You may intercept such conversations. In the event that you intercept telephone conversations which may constitute evidence of other criminal offenses, you must notify the case agents or the supervising AUSAs as soon as practicable so that we can inform the Court of these developments.

The telephone conversations intercepted pursuant to the Court's order are expected to

concern the specifics of the above-listed offenses, including: (I) the nature, extent and methods of the target subjects illegal activities; (ii) the identities and roles of participants in the illegal activities, including accomplices, aiders and abettors, co-conspirators and other participants in their illegal activities; and  (iii) the nature and extent of efforts taken by the target subjects to obstruct the investigation and prosecution of their crimes.

The Court's authorization to intercept wire communications extends to voice communications, including background conversations intercepted while the telephone is activated or in use.

We are required to report to the Court the identities of persons whom we have intercepted on the telephone.  You should, therefore, attempt to identify as many persons as you can by name, nickname and voice, as well as by comparing the intercepted conversation with other evidence developed during the course of the investigation.  *See* Section III of this memorandum for further information regarding the identification of voices.  Since the ultimate goal of this investigation is the identification, prosecution and conviction of those involved in the subject criminal activity, it is imperative that continuing efforts be made to establish and confirm the identities of participants in the intercepted conversations.  Any newly acquired information regarding the identification of speakers should be passed on to the monitoring agents on the next shift, as well as to the case agents.  The identification of voices overheard during the interception will also facilitate compliance with the Court's order regarding the minimization of innocent conversations.

## II.  MINIMIZATION OF INNOCENT CONVERSATIONS

Our procedure will require the monitoring to be conducted so as to reduce to the smallest possible number the interceptions of "innocent" communications over the target telephones.  In this context, the word "possible" means feasible or practicable, consistent with the object of obtaining evidence of the criminal activity described in the interception order.  In the beginning, it will be necessary to monitor and record all telephone conversations of the named interceptees until such time as monitoring agents determine that a particular conversation does not deal with the illegal activities under investigation.  If such a determination is made, the call should be

minimized, that is, all listening and recording shall cease immediately, subject to spot monitoring, as described below.[1]

It is suggested that each monitor must conduct his or her minimization in a consistent manner throughout the period of interception, and in a manner that can be articulated at a resulting trial or suppression hearing.  If the initial monitoring of a conversation indicates that the conversation should be minimized,  the minimization function of the equipment should be activated or in the event that is inoperable, the recording system should be switched off.  In no event should you fail to minimize simply because the minimization "button" does not work - seek the next best method - turn the system off and on.

As the monitoring progresses, it may become increasingly clear that the named interceptees have a number of conversations with certain persons which will be entirely innocent in nature.  Consequently, a **pattern of innocence** will be established for calls between the named interceptees and such persons, and once they are identified as a participant in a conversation the conversation should not be monitored or recorded.  It should, however, be spot checked to determine that the conversation still involves the "innocent party" or the topic has not changed.

Conversely, a **pattern of involvement** has been established between the interceptees named in the Court's Order.  Additional patterns of involvement may be established as to certain other persons with whom the named interceptees discuss matters related to the subject offenses. If during the course of the monitoring, one or more individuals involved in the conversation is identified by name, nickname, voice or otherwise as a co-conspirator, accomplice, aider or abetter, supplier or customer of controlled substances, or is otherwise involved in the commission of the subject offenses, then you may monitor and record those conversations until such time as it appears that no criminally-related conversations are taking place or will occur.  At that point you should minimize the conversation.  However, because a pattern of involvement has been determined for that party, spot monitoring should be conducted at more frequent intervals and for more extended periods.

When deciding whether or not to minimize a conversation, you should keep in mind that

---

[1]     The equipment in the monitoring room will not permit the monitoring of a conversation unless the conversation is being recorded.

the named interceptees are known to discuss criminal activities in cryptic or coded phrases or for very short periods of time in the midst of sometimes lengthy conversations regarding non-criminal matters. Supplemental instructions will be provided in this regard as persons are identified and patterns develop regarding either their involvement in the commission of the subject offenses or the manner in which they discuss criminal activity on the telephone. Supplemental instructions will also be provided if a new or different pattern of conversation develops during the course of the interceptions. If you become aware of information which could warrant reconsideration of a pattern previously established, such information should be brought to the immediate attention of the case agents and the supervising AUSAs.

## III. CONVERSATIONS WITH UNKNOWN INDIVIDUALS

In the event conversations between named interceptees and unknown individuals, that is, a person for whom no pattern of innocence or involvement has been established, are intercepted, monitoring agents should attempt to determine whether the conversation involves the illegal activities described in the Order and spot monitoring will be more frequent and for longer intervals. If it does not, listening and recording should cease, subject to spot monitoring, as described below, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the discussion does involve illegal activities, every effort should he made to identify the participants for the reasons set forth above. There are numerous methods for identifying unknown speakers, including, but not limited to, the following:

a. Internal identifiers exist when a caller or operator asks for a specific person, or the person who answers the phone identifies himself or herself. Similarly, when a caller asks to be connected to a third party via a three-way calling function, the caller may identify the additional individual with whom he or she wishes to speak. Even if a name or nickname is not mentioned during the conversation, a participant may mention other types of information from which his or her identity may be tentatively or conclusively determined, e.g., birthday, mother's name, type of car, place of residence, and date of a court appearance or prior conviction.

b. Pen register, subscriber records, business records, property deeds and leases can be

used, together or separately, to identify the location of a particular phone and the person or persons who use or are likely to use that telephone. If a call is placed or forwarded to a number for which subscriber and other identifying records have not previously been obtained, efforts should be made promptly to obtain this information. Similar efforts should be made when a telephone pager number is identified.

c. Physical surveillance can be used in the identification process when a participant in the conversation indicates that he or she will be at a given location at a particular time. Police reports and traffic tickets can provide a similar type of identification if a participant mentions that he or she was stopped, arrested or ticketed on a particular day or at a particular location. If a subject states that he or she was incarcerated at a particular time or in a particular location, or is calling from jail, prison records should be consulted. Other examples of what might be termed after-the-fact surveillance may arise during the course of the interceptions.

## IV. SPOT MONITORING

After a call is minimized, it is possible that the participants in the conversation will subsequently discuss matters related to the criminal offenses under investigation. It is also possible that a discussion involving the commission of the subject offenses will begin after another individual joins the conversation or after the initial parties are connected to a third party via three-way calling. To guard against missing a conversation which may be intercepted under the Court's order, spot monitoring should be utilized.

This spot monitoring of minimized conversations should be done in a consistent manner. For example, if a conversation is minimized, you might spot check the conversation after one minute. The lengths between spot checks should be uniform and a period of thirty (30) seconds is suggested. Variances from the pattern must be done only for articulated reasons. You must also note, on the forms provided for monitoring, the duration of the call, and the duration of any minimization which has transpired during a given conversation.

To spot monitor, turn the recording-monitoring equipment on periodically and listen for a few moments or exchanges of conversation. If, during this brief period, no conversations are intercepted involving the subject offenses, cease recording and monitoring. If, however, such

conversations are overheard during the spot monitoring, or if the parties are discussing other criminal offenses, then continue to monitor in accordance with the instructions set forth in this memorandum.

Spot monitoring is particularly important whenever a conversation between named interceptees, or between a named interceptee and a subsequently identified co-conspirator or accomplice, is minimized because the conversation relates to non-criminal matters. The named interceptees may intersperse criminally-related discussions in the midst of lengthy non-criminal conversations, and the possibility for this pattern should be kept in mind during spot monitoring.

Once it has been ascertained by the monitoring agent that a conversation falls in one of the four privileged classes, then minimization must begin immediately. Spot monitoring is permissible to ascertain that the privilege is not being used as a subterfuge to cover otherwise pertinent conversation. The privileged nature of the conversation should be kept in mind when spot monitoring the conversation, i.e., be quick about it.

## V. PRIVILEGED COMMUNICATIONS

We may not use as evidence any otherwise privileged communication intercepted in accordance with a court order. Unless a third party is involved in the conversation, such as through the use of three-way calling, conversations between attorney and client, husband and wife, clergyman and penitent, and physician and patient may be privileged.

Attorney-Client discussions which involve a pending case or appeal should not be intercepted, and the monitoring agent must immediately shut off the equipment and make an appropriate notation in the logs, as indicated below.

If such a conversation is intercepted in whole or part, the fact should be brought to the immediate attention of Special Agents Pardee and Bevington and the AUSAs.

In the event a conversation with an attorney relates to matters other than a pending case or appeal, the monitoring agent should cease monitoring and recording as soon as there is a determination that the conversation involves confidential communications between an attorney and his or her client or as soon as a determination is made that the conversation does not deal with the illegal activities described in the authorization order. Conversely, if the discussion

discloses that the attorney is involved in the commission of illegal activity, the call should be monitored and recorded. At the earliest practicable time, Special Agents Pardee and Bevington and the AUSAs should be notified about this type of interception.

Husband-Wife conversations are also ordinarily privileged where they do not involve criminal activity. In the event a conversation between a husband and wife is intercepted, monitoring and recording should cease as soon as there is a determination that the conversation does not deal with the illegal activities described in the Court's order. Since it is possible, however, that a subject's wife or husband may act as a partner, message taker or message deliver, and perhaps as a principal in illegal activity, the conversation may properly be subject to interception. Pay particular attention to patterns of innocence or patterns of involvement. Of course, no legal privilege exists with regard to conversations between a subject and his or her paramour.

Clergyman-Penitent communications, as a general rule, are not likely to involve the illegal activities specified in the Court's order. In order to be privileged, however, such conversations must relate to subjects one would normally discuss with or seek counseling from a clergyman. Be alert to patterns of involvement or innocence.

Physician-Patient conversations may also be privileged, but only where they relate to matters of physical, mental, or emotional health. Again, consider patterns of involvement or innocence.

If any privileged conversations are recorded, their content should not be disclosed to any other investigative or police agency, nor should additional investigation be based upon the contents of such communications. In the event a privileged conversation is mistakenly intercepted, the conversation should be recorded on the sealed disk that will remain in custody at the direction of the Court. Such conversations should not be included in the copies or transcripts of the tapes.

Once it has been ascertained by the monitoring agent that a conversation falls in one of the four privileged classes, then minimization must begin immediately. Spot monitoring is permissible to ascertain that the privilege is not being used as a subterfuge to cover otherwise pertinent conversation. The privileged nature of the conversation should be kept in mind when spot monitoring the conversation, *i.e.*, be quick about it.

VI.  **FOREIGN LANGUAGE INTERCEPTIONS**

We reasonably expect that the bulk of the conversations intercepted in this surveillance will be conducted in English.  If, however, it is determined that foreign languages are being spoken, duly authorized foreign language speaking monitors will be utilized  during all monitoring sessions over the course of this surveillance.  In the unlikely event that due to illness or some other emergency a foreign language speaking monitor is not available to interpret the conversation and apply the above guidelines to monitoring, the law provides for the interception in its entirety of any conversation which can not be minimized because its is conducted in a foreign language not spoken by the monitor on duty.  When such an emergency occurs necessitating recording foreign language conversations in their entirety, the monitoring agent or officer should immediately contact the case agents **and** the supervising AUSAs for guidance and instruction.  Whether or not the monitoring agent or officer is able to contact the case agents **and/or** the supervising AUSAs, the monitoring agent or officer should make every effort to obtain the assistance of a duly authorized foreign language speaking monitor.

VII.  **MAINTAINING THE LOG**

The overall goal in maintaining the log is to demonstrate to the Court through the log that we made every effort possible to minimize interception of otherwise innocent conversations while at the same time maintaining a true and accurate record of the activity on the phone.  If we fail to comply with the requirements of minimization, the remedy may be suppression of evidence seized during and as a result of the monitoring.  If we fail to maintain accurate records of the conversations in the log, it may cloud the chain of custody of the disks sufficiently that the conversations themselves could be inadmissible at trial.  In short, if we do not do an accurate job of record keeping, all your efforts will be wasted. In maintaining the log the following procedures should be followed:

A.      At the beginning of each shift, the log should reflect the following:

     1. The change in shift.

     2. The names of the agents in the new shift and the functions performed by each.

     3. The working status of the equipment.

     4. The number of the tape and the counter number showing on the tape recorder at the time of shift change.

B.     Each agent participating in the monitoring shall assist in maintaining the log in the following fashion:

     1.     If a conversation is intercepted, the log should reflect the following:

          a.     Date, time, and duration of the interception and minimization, if any.

          b.     Disk number and counter number of the conversation.

          c.     The participants, if known or identified by name or nickname and the number called or calling in.

          d.     Subject of the call.

          e.     Abbreviated contents of the conversations where pertinent, including any peculiarities, code words, foreign language use, or background noises.

     2.     In addition to the above, the log should also reflect the following:

a.    In the event conversations between a husband-wife, clergyman-
      penitent, physician-patient or attorney-client (not involving a
      pending case or appeal) are monitored:

      (1)  the nature of the relationship and the identities, if known; and

      (2)  the fact that Special Agents Pardee or Bevington were notified
      of the monitoring and the date and time of that notice.

b.    In the event conversations between individuals in the relationship
      of attorney-client are monitored which concern a pending case:

      (1)  the fact that the recording device was shut off (which
      automatically turns off the listening ability);

      (2)  the identities of the parties; and

      (3)  the fact that Special Agents Pardee or Bevington were notified
      of the monitoring  and the date and time of that notice.

c.    In the event a call dealing with crimes not specified in the original
      order is monitored:

      (1)  the identities of the parties monitored;

      (2)  the nature of the non-specified criminal activity; and

      (3)  the fact that Special Agents or  Bevington were notified and
      the date and time of that notice.

VIII.  **MECHANICAL FAILURES**

If there is a mechanical malfunction in the wire intercept equipment, this fact should be reflected in the log along with the cause and duration of the malfunction.  If a conversation is being monitored when a mechanical breakdown occurs, and the malfunction prevents the recording of the conversation, the agents should attempt to take verbatim notes and reconstruct the conversation following its termination.  In the event a mechanical failure occurs, the monitoring agent should at once notify Special Agents Pardee or Bevington.  The AUSAs must also be notified promptly because these matters will be brought immediately to the attention of the Court.

IX.  **Duties of Supervising Agents.**

The Supervising Agent should prepare and deliver to the supervising attorney daily written reports of the previous day's monitoring.  The logistics of this delivery will be determined by the supervising agent and the supervising attorney. They should show the nature and scope of the interception for that day.  For instance, they should indicate the number of relevant conversations that were intercepted, the number of calls minimized, the number of non-pertinent conversations terminated, whether any of the individuals named in the Order was intercepted, whether any new participants were identified and whether any problems have arisen. Equipment malfunctions must be noted.  The interception of privileged communications or evidence of other crimes must also be noted.  These daily reports should be made even throughout a weekend or holiday period.  A copy of the corresponding day's log should accompany each report.  The supervising agent's duties include providing for the integrity and admissibility of recordings by following the principles set forth herein and ensuring proper termination of the interception either on the days specified in the Court Order or when the objects of the interception have been accomplished, whichever comes first.

X.  **PROTECTION OF THE RECORDING.**

The statute commands that, "The recording of the contents of any wire or oral communication under this subsection shall be done in such a way as will protect the recording

from editing or other alterations." [Section 2518(8)(a)]. Accordingly, the following procedures should be followed during the period of authorized interception:

(a)     Either during or at the end of each recording period, a copy of the recorded communications should be made for the use of the investigative agency and the supervising attorney.

(b)     The original recording maintained in the Voicebox system until it is until it is made available to the Court for sealing at the expiration of the period of the Order(s). At that time appropriate copies will be made for subsequent use in the investigation and resultant prosecution.

(c)     A chain of custody form should accompany the original recording. On this form should be a brief statement, signed by the agent supervising the interception, which identifies:

(I)     The Order which authorized the recorded interceptions by number, if possible. The number of the authorization in this instance is Miscellaneous No. 07-001 (D.D.C.)

(ii)    The date and time period of the recorded conversations.

(iii)   The identity (*where possible*) of the individuals whose conversations were recorded.

(d)     Each agent or other persons signing the chain of custody form should be prepared to testify in Court that the original tape, while in his custody, was kept secure from the access of third parties (unless so noted on the form) and was not altered or edited in any manner. It is the responsibility of the

investigative agency to ensure that original recordings in their custody will
be maintained in such a way as to ensure their admissibility in evidence at
trial over objections to the integrity of the recording.

## XI.  PROCEDURE WHEN NO RECORDING CAN BE MADE.

In those unusual instances where the monitoring equipment fails and no recording of the
intercepted communications is made, the following procedure should be utilized:

(a)    If it is intended that the overheard conversation be introduced in evidence at trial,
(and you should assume that any conversation which is not minimized will be
introduced at trial) the intercepting agent should make a contemporaneous log or
memorandum.  This log should be as near to a verbatim transcript as is possible
under the circumstances of the interception.

(b)    The log or memorandum should close with a brief statement signed by the agent
indicating the date, time, and place of the intercepted conversation.  The Order
authorizing the interception should be identified.  The agent should indicate that
the log or memorandum contains the contents of the intercepted communication
which he has overheard.  If any other person monitors the conversation that person
should be identified and participate in the effort to create a verbatim transcript.
This should be followed by the signatures of all persons who overheard the
unrecorded conversation and who participated  in the effort to create a verbatim
transcript.

(c)    This log or memorandum should be treated by the investigative agency as if it
were an original recording of the intercepted communication, and the procedure
outlined in section X, *supra*, should be followed.

## XII.  AUSA POINTS OF CONTACT

AUSAs Anthony Scarpelli and William J. O'Malley, Jr.,  are available to answer questions at any time and should be contacted whenever significant events warrant immediate attention.  They can be reached at the following numbers:

Anthony Scarpelli                     Bill O'Malley

Work:  (202) 353-1679              Work:  (202) 305-1749

Cell:    (202) xxx-xxxx              Cell:   (xxx) xxx-xxxx

Home: (xxx) xxx-xxxx              Home: (xxx) xxx-xxxx

Back-up cell: (xxx) xxx-xxxx

The case agents in this investigation are:

Ryan Pardee                          MPD Officer Michaeal Eames

(Desk) 278-xxxx                      (Desk) (xxx) xxx-xxxx

(Cell)  xxx-xxxx

John Bevington

(Desk) 278-xxxx

(Cell)  xxx-xxxx

## <u>SIGN IN SHEET FOR MINIMIZATION MEETING</u>

**NAME**          **DATE**          **AGENCY/SQUAD**          **PHONE/CELL**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Criminal No. 07-152 (ESH)** |
| | : | |
| **ANTHONY MAURICE SUGGS,** *et al.*, | : | |
| Defendants. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'**
**JOINT MOTION TO SUPPRESS WIRETAP EVIDENCE**

_____**ATTACHMENT B**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Criminal No. 07-152 (ESH)** |
| | : | |
| **ANTHONY MAURICE SUGGS, *et al.*,** | : | |
| Defendants. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'**
**JOINT MOTION TO SUPPRESS WIRETAP EVIDENCE**

**Annotations in Response to Defendants'**
**Sample Non-Pertinent, Non-Minimized Intercepts**

1.    Activations 29, 93 and 125 all were intercepted on January 1, 2007, during the first twenty-five hours of interception.

        a. Activation 29 is a conversation between defendant Suggs and and his co-conspirator, Ngozi Joy, intercepted on January 1, 2007, at 11:26 a.m. The duration of the call was five minutes and fifty-seven seconds. Suggs and Joy discussed Suggs receiving a ticket for parking in the 4000 block of 10th Street, Northeast, Washington, D.C. The conversation was significant because prior to the call, law enforcement was not certain as to where Suggs was living.

        b. Activation 125 is a conversation between Suggs and his aunt, Barbara Cobb, intercepted on January 1, 2007, at 9:00 p.m. The duration of the call was eight minutes and forty-one seconds. Suggs and Cobb discuss James Gaston, a known heroin trafficker.

2.    Activation 372 is a conversation between Suggs and John Watson intercepted on January 13, 2007, at 6:31p.m. The duration of the call was three minutes and thirty-four seconds. Watson was incarcerated at FCI Petersburg.

3.    Activation 559 is a conversation between Suggs and an unknown male intercepted on January 15, 2007, at 5:39 p.m. The duration of the call is two minutes and three seconds. However, the conversation is actually less than two minutes because the overall call duration includes that period of time when the telephone was ringing.

4.    Activation 709 is a conversation between defendant Suggs and and his co-conspirator, Ngozi Joy, intercepted on January 17, 2007, at 2:29 p.m. The duration of the call is two minutes and six seconds. However, the conversation is actually less than two minutes because the overall call duration includes that period of time when the telephone was ringing. Additionally, Suggs was placed on hold for a period of time.

5.     Activation 927 is a conversation between Suggs and James Gaston intercepted on January 19, 2007, at 6:37 p.m.  The duration of the call is three minutes and fifty-six seconds.  Gaston is a known heroin trafficker who had recently been released from prison to a halfway house.

6.     Activation 1173 is a conversation between Suggs and Watson intercepted on January 22, 2007, at 9:10 p.m.  The duration of the call is four minutes and forty seconds.  Watson was incarcerated and they discussed Rashee Rich who was in a halfway house with James Gaston.  Rich, like Gaston, is known to sell drugs in the Washington, D.C., area.

7.     Activation 1576 began as a conversation between Suggs and a male believed to be Robert Waller intercepted on January 27, 2007, at 4:42 p.m.  During the conversation Suggs switched to a call with a male believed to be Charles Jones.  Neither conversation exceeds two minutes.

8.     Activation 1823 is a conversation between Suggs and a male believed to be Charles Jones intercepted on January 30, 2007, at 9:27 p.m.  The duration of the call is three minutes and thirty-eight seconds.  During the conversation Suggs and Jones discuss Suggs's cousin and drug customer, Glendale Lee.

9.     Activation 1874 is conversation between Suggs and a male believed to Robert Waller intercepted on January 31, 2007, at 9:59 p.m.  The duration of the call is five minutes and twenty-nine seconds.  During the conversation Suggs and Waller discuss Suggs's cousin and drug customer, Glendale Lee.

10.     Activation 2212 began as a conversation between Suggs and his father, Carlton Hill.  Hill subsequently spoke with his sister Patricia Hill who used Suggs cellular telephone.  The call was intercepted on February 4, 2007, at 9:26 p.m.  The duration of the call is two minutes and nine seconds.  However, the conversation is actually less than two minutes because the overall call duration includes that period of time when the telephone was ringing.

11.     Activation 2825 is a conversation between Suggs and a male believed to be Charles Jones intercepted on February 16, 2007, at 6:44 p.m.  The duration of the call is four minutes and three seconds.  During the call Suggs was placed on hold for over one minute.

12.     Activation 3025 is a conversation between Suggs and Camila Burton intercepted on February 19, 2007, at 10:40 a.m.  The duration of the call is two minutes and six seconds.  However, the conversation is actually less than two minutes because the overall call duration includes that period of time when the telephone was ringing.

13.     Activation 3325 is a conversation between Suggs and Camila Burton intercepted on February 23, 2007, at 2:43 p.m.  The duration of the call is two minutes and twelve seconds.

2

However, the conversation is actually less than two minutes because the overall call duration includes that period of time when the telephone was ringing.

14.     Activation 3708 is conversation between Suggs and a male believed to Robert Waller intercepted on March 1, 2007, at 12:24 p.m.  The duration of the call is four minutes and thirty-one seconds.  During the conversation Suggs and Waller discuss Suggs's cousin and drug customer, Glendale Lee.

15.     Activation 5167 is a conversation between Suggs and his father, Carlton Hill, intercepted on March 1, 2007, at 5:33 p.m.  The duration of the call is three minutes and forty-five seconds.  During the conversation Suggs provided Hill with detailed directions to Suggs' co-conspirator Julian Johnson's apartment.  Prior to this conversation, law enforcement did not know where Johnson's apartment was located.  That apartment was searched on June 19, 2007 pursuant to a search warrant and law enforcement recovered $25,000 in cash.

16.     Activation 6142 is a conversation between defendant Suggs and and his co-conspirator, Ngozi Joy, intercepted on April 2, 2007, at 1:27 p.m.  The duration of the call is three minutes and three seconds, but the conversation was monitored for approximately one minute.