IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No 07-152 (ESH) |
| | : | |
| ANTHONY M. SUGGS, *et al* | : | |

DEFENDANTS' JOINT MOTION TO SUPPRESS WIRETAP EVIDENCE

Defendant, Helery Price, through undersigned counsel, on behalf of all of the remaining Defendants in the case,[1] respectfully requests that this Court suppress all evidence against him arising from the unlawful electronic surveillance conducted by the Government on a telephone belonging to Anthony Suggs. As grounds therefore, Defendant states:

I. BACKGROUND

1. The superseding indictment jointly charges the five Defendants who remain in the case, Anthony Maurice Suggs, James Lawrence Parker, Ernest Milton Glover, Glendale Earl Lee and Helery Price, with one count of narcotics conspiracy involving the distribution and possession with intent to distribute of one kilogram or more of PCP, and a criminal forfeiture count. Three of the defendants, Suggs, Parker, and Glover, are also charged with individual counts. Defendants Lee and Price are <u>not</u> charged with any individual counts. The case is also related to another case, *United*

---

[1] This Court has directed that a pleading filed by one defendant shall be deemed filed as to all defendants, unless a defendant specifically excludes himself. The Court has also designated undersigned counsel to "coordinate" discovery issues and the filing of motions among the defendants.

*States v. Lonell G. Glover*, Crim. No. 07-153 which charges some 19 defendants with one count of narcotics conspiracy involving the distribution and possession with intent to distribute of one kilogram or more each of PCP and heroin, and a criminal forfeiture count.

2. The indictment is apparently based, at least in part, upon evidence uncovered as a result of eleven court orders authorizing electronic surveillance; these orders resulted in over 1,800 hours of interceptions with over 34,000 "activations." Three of the surveillance orders, one initial authorization and two extensions, concerned the telephone belonging to Anthony Suggs. Each of the remaining defendants were also recorded on the wiretap of this telephone.

3. The United States also obtained authorization for electronic surveillance on the telephone of Lonnell Glover, the lead defendant in the related case, as well as on a truck belonging to Glover. To the best of the knowledge of undersigned counsel, only Suggs appears on these wiretaps; however, the discovery is not complete.[2] Defendant Suggs, and any other defendants who might appear on either of those wiretaps, would reserve the right to supplement this Motion as to the Glover wiretaps.

4. Finally, the United States also obtained authority to electronically record calls

---

[2] Some of the critical information in analyzing the results of a wiretap are what are known as the "linesheets" which are files which list in sequence the data from the each activation on a wiretap, as well as contemporaneous synopsis of the intercepted conversation. The information includes the date, time and duration of the call, whether the call was incoming or outgoing, the other telephone number, whether the call was deemed "pertinent" by the listening agents at the time, and whether the call was "minimized." The file containing the linesheets for the Glover telephone is nearly 46,000 kb in size and "crashes" both counsel's laptop and desktop computers. Counsel has requested that the United States break the file into smaller components, say 10,000 kb or less, and the United States has agreed to do so. Although undersigned counsel could download the linesheets for the Glover truck wiretap, he has experienced difficulty in getting it to print out.

on the telephone belonging to Velma Williams, one of the alleged coconspirators in the Glover case. To the best of the knowledge of undersigned counsel, no defendant from this case appears on these wiretaps.

II. THE SUGGS WIRETAP

5. The United States determined that Defendant Suggs was using a cellular telephone with the number 240-988-7588. It first sought approval for a wiretap on this telephone on January 8, 2007 from Honorable Rosemary Collyer, a judge of this Court. Attached to the government's application was an Affidavit from FBI Special Agent Ryan Pardee. Judge Collyer approved the application on the same day.[3]

6. The Affidavit from Special Agent Pardee set forth the probable cause to believe that federal drug offenses were occurring and that Suggs and others were involved. It also set forth the objectives of the wiretap and the reasons why other investigative techniques would not achieve the same results. Finally, the Affidavit discussed the "minimization" of "non-pertinent" calls:

> 57. Monitoring of an intercepted conversation will be immediately terminated when it is determined that the conversation's subject matter is unrelated to communications subject to interception under Chapter 119 Title 18, United States Code. Interception will be suspended immediately when it is determined, through voice identification, physical surveillance, or otherwise that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Reasonable spot monitoring will be utilized to ensure that minimized calls have not become criminal in

_____

[3] The format in which counsel for Defendants received the wiretap applications, affidavits and orders made each page a separate file. Defendant does not seek to attach those pleadings for the Court's review because the number of attached "files," hundreds of them, would be extremely cumbersome to file electronically, if it could be done at all.

nature. Monitoring will be conducted by Special Agents and/or FBI Task Force Agents, under the supervision of investigative or law enforcement officers authorized to conduct the interception. Your affiant, as well as other agents and investigators participating in this interception of wire communication, will operate all equipment necessary to monitor all calls, and the FBI will maintain custody of the logs of conversations monitored.

7. The Application to Judge Collyer contained the following language about minimization:

IT IS FURTHER REQUESTED that this Court direct that its Order be executed as soon as practicable after it is signed and that all monitoring of wire communication shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 Title 18, United States Code. If the conversation is minimized, the monitoring agent shall use reasonable spot monitoring to ensure that minimized calls have not become criminal in nature. Special attention will be given to minimize all privileged communications. Monitoring will be conducted by Special Agents and/or FBI Task Force Agents, certified support personnel or contract personnel under the supervision of investigative or law enforcement officers authorized to conduct the interception....

Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.

8. The Order of Judge Collyer specifically covered the question of minimization:

FURTHER ORDERED that this order shall be executed as soon as practicable and that all monitoring or wire communication shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation...

Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to ensure that the conversation has not turned to criminal matters. Special attention should be given to minimize all privileged communications.

9. After Judge Collyer approved the application, the Office of the United States Attorney  prepared a written memorandum, dated January 9, 2007, to instruct agents conducting the wiretap on the procedures to be followed (hereinafter the "operating procedures"). It is the understanding of counsel that agents attending a briefing on the procedures were required to sign a form indicating that they had been briefed on the required procedures; however, the copy of the operating procedures recently provided to counsel does not have the completed page where the agents would have signed in.

10. The operating procedure contained the following language concerning minimization:

**II. MINIMIZATION OF INNOCENT CONVERSATIONS**

Our procedure will require the monitoring to be conducted so as to reduce to the smallest possible number the interceptions of "innocent" communications over the target telephones. In this context, the word "possible" means feasible or practicable, consistent with the object of obtaining evidence of the criminal activity described in the interception order. 1n the beginning, it will be necessary to monitor and record all telephone conversations of the named interceptees until such time as monitoring agents determine that a particular conversation does not deal with the illegal activities under investigation. If such a determination is made, the call should be minimized, that is, all listening and recording

shall cease immediately, subject to spot monitoring, as described below.

It is suggested that each monitor must conduct his or her minimization in a consistent manner throughout the period of interception, and in a manner that can be articulated at a resulting trial or suppression hearing. If the initial monitoring of a conversation indicates that the conversation should be minimized, the minimization function of the equipment should be activated or in the event that it is inoperable, the recording system should be switched off. In no event should you fail to minimize simply because the minimization "button" does not work - seek the next best method - turn the system off and on.

As the monitoring progresses, it may become increasingly clear that the named interceptees have a number of conversations with certain persons which will be entirely innocent in nature. Consequently, a **pattern of innocence** will be established for calls between the named interceptees and such persons, and once they are identified as a participant in a conversation, the conversation should not be monitored or recorded. It should, however, be spot checked to determine that the conversation still involves the "innocent party" or the topic has not changed.

Conversely, a **pattern of involvement** has been established between the interceptees named in the Court's Order. Additional patterns of involvement may be established as to certain other persons with whom the named interceptees discuss matters related to the subject offenses. If during the course of the monitoring, one or more individuals involved in the conversation is identified by name, nickname, voice or otherwise as a co-conspirator, accomplice, aider or abetter, supplier or customer of controlled substances, or is otherwise involved in the commission of the subject offenses, then you may monitor and record those conversations until such time as it appears that no criminally-related conversations are taking place or will occur. At that point you should minimize the conversation. However, because a pattern of involvement has been determined for that party, spot monitoring should be conducted at more frequent intervals and for more extended periods.

When deciding whether or not to minimize a conversation, you should keep in mind that the named interceptees are known to discuss criminal activities in cryptic or coded phrases or for very short periods of time in the midst of sometimes lengthy conversations regarding non-criminal matters. Supplemental instructions will be provided in this regard as persons are identified and patterns develop regarding either their involvement in the commission of the subject offenses or the

> manner in which they discuss criminal activity on the telephone. Supplemental instructions will also be provided if a new or different pattern of conversation develops during the course of the interceptions. If you become aware of information which could warrant reconsideration of a pattern previously established, such information should be brought to the immediate attention of the case agents and the supervising AUSAs.

The operating procedures also set forth procedures for spot monitoring.

11. Although the Application and the Court's Order only directed that "special attention" be given to minimize privileged communications, the operating procedures went into more detail:

### V. PRIVILEGED COMMUNICATIONS

> We may not use as evidence any otherwise privileged communication intercepted in accordance with a court order. Unless a third party is involved in the conversation, such as through the use of three-way calling, conversations between attorney and client, husband and wife, clergyman and penitent, and physician and patient may be privileged.

> Attorney-Client discussions which involve a pending case or appeal should not be intercepted, and the monitoring agent must immediately shut off the equipment and make an appropriate notation in the logs, as indicated below.

> If such a conversation is intercepted in whole or part, the fact should be brought to the immediate attention of Special Agents Pardee and Bevington and the AUSAs.

> In the event a conversation with an attorney relates to matters other than a pending case or appeal, the monitoring agent should cease monitoring and recording as soon as there is a determination that the conversation involves confidential communications between an attorney and his or her client or as soon as a determination is made that the conversation does not deal with the illegal activities described in the authorization order. Conversely, if the discussion discloses that the attorney is involved in the commission of illegal activity, the call should be monitored and recorded. At the earliest practicable time, Special

Agents Pardee and Bevington and the AUSAs should be notified about this type of interception.

...

Once it has been ascertained by the monitoring agent that a conversation falls into one of the four privileged classes, then minimization must begin immediately. Spot monitoring is permissible to ascertain that the privilege is not being used as a subterfuge to cover otherwise pertinent conversation. The privileged nature of the conversation should be kept in mind when spot monitoring the conversation, *i.e.,* be quick about it.

12. The United States sought, and received, two extensions of the wiretap on the telephone of Defendant Suggs on February 7, 2007 and March 9, 2007. In both cases a supplemental affidavit from Special Agent Pardee was attached. (The second request for an extension was a joint request for an extension that included an extension for the wiretap on the Glover telephone as well.) The applications, affidavits and orders for the extensions also included language identical to the initial paperwork concerning minimization and privileged communications.

III. PROBABLE CAUSE, "NECESSITY" AND CONTINUING THE WIRETAPS

13. Defendant Price does <u>not</u> contest the probable cause findings, based upon the three affidavits, as far as Defendant Suggs is concerned. (Whether there was probable cause to believe that Defendant Price or any of the other named interceptees were involved in the conspiracy is irrelevant for purposes of this Motion, as the wiretap would be lawful even if Suggs were the only person against whom there was probable cause to tap his telephone.) In making this concession, Defendant Price relies solely on

the fact of the affidavits. He would note, however, that counsel for Defendant Suggs has only recently entered the case, and therefore, <u>expressly reserves</u> the right of Defendant Suggs, through counsel, to provide the Court with a showing that one or more of the affidavits were knowingly false so as to trigger the requirement for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

14. Likewise, again subject to the right of Defendant Suggs to supplement the record, Defendant Price does not contest the conclusion that no other investigative sources would achieve two of the primary objectives of the investigation - determining (1) from whom Suggs allegedly received the drugs he sold, and (2) who were his "primary" wholesale customers. The issue becomes therefore whether there was any "necessity" in extending the wiretap.

15. By the conclusion of the first 30-day wiretap authorization, the government had determined, to their satisfaction, that Lonnell Glover was Suggs' supplier of PCP, that there appeared to be no other source of cocaine other than from Texas, involving Julian Johnson, which had been intercepted prior to start of the wiretap. The government also determined, in their opinion, that Defendant Price was a customer of Suggs; no other "new" customers of Suggs other than those identified in the original application had been developed. Defendants therefore contend that the major purposes of the wiretap had been achieved and that it should not have been extended.

16. Using identical language in all three authorization order, judge Collyer described the purposes of the wiretap:

In particular, these wire communications will concern the: (i) the nature,

scope, extent and methods of operation of the narcotics trafficking activities in which the targeted subjects and others as yet unknown or not yet fully identified are engaged; (ii) the methods of operation and procedures of the targeted subjects including, but not limited to, the means and manner by which individuals are obtaining and redistributing large quantities of PCP, cocaine and cocaine base, also known as crack cocaine, in various locations in the United States; (iii) the identities, roles, and telephone numbers of co-conspirators, accomplices, aiders and abettors and other participants in such illegal activity; (iv) the source of money and controlled substances, primarily PCP, cocaine and cocaine base, also known as crack cocaine; (v) the manner in which these illegal activities are being conducted, including the distribution and possession of said controlled substances and transfer of the contraband and money involved in those activities; (vi) the existence and location of apartments, residences, businesses and other premises used in the furtherance of the illegal activity; (vii) the methods of operation for laundering proceeds of illegal drug sales; (viii) the existence and location of records of the illegal activity; (ix) the existence, location and source of resources used to finance the illegal activity; (x) the existence, location and disposition of proceeds from the activity; (xi) the existence and location of any other items or means used in furtherance of those activities; (xii) the dates, times, and details for the continued commission of the above-mentioned offenses; and (xiii) other evidence necessary for successful prosecution and conviction of the above-described criminal activity. In addition, the communications are expected to constitute admissible evidence of the commission of the above-described offenses.

Defendants believe it is important to carefully examined the proffered "purposes."

A. "Catch-All" Purposes

17. The last two items - "other evidence necessary for successful prosecution and conviction of the above-described criminal activity," and "admissible evidence of the commission of the above-described offenses," are merely catch-all provisions. Likewise, Defendants assert that item "(xi) :the existence and location of any other items or means used in furtherance of those activities," is equally undefined. Defendants agree that the government may make use of "evidence" it uncovers during a lawful wiretap, but does

not understand Congress to have intended that a generic search for unspecified "evidence" would to be enough to warrant a wiretap.

B. The Scope Of The Conspiracy

18. The following items, although essentially similar, are, as Defendants understand it, the fundamental purpose of the wiretap:

(i) the nature, scope, extent and methods of operation of the narcotics trafficking activities in which the targeted subjects and others as yet unknown or not yet fully identified are engaged,

(ii) the methods of operation and procedures of the targeted subjects including, but not limited to, the means and manner by which individuals are obtaining and redistributing large quantities of PCP, cocaine and cocaine base, also known as crack cocaine, in various locations in the United States,

(iii) the identities, roles, and telephone numbers of co-conspirators, accomplices, aiders and abettors and other participants in such illegal activity,

(iv) the source of money and controlled substances, primarily PCP, cocaine and cocaine base, also known as crack cocaine.

(v) the manner in which these illegal activities are being conducted, including the distribution and possession of said controlled substances and transfer of the contraband and money involved in those activities.

19. Once the initial 30-day wiretap was completed, however, the United States understood who were Suggs' sources of drugs and who his primary, wholesale customers were; the United States understood that when Suggs had drugs to sell, he would either contact by telephone or be contacted and would arrange to meet his customers. As far as Suggs' operation was concerned, the United States thus knew the parameters and the main participants.

20. In the affidavits in support of the extensions, the FBI speculates that Suggs may have had other sources of drugs, but that is pure speculation. Indeed, the conclusions of the agents monitoring the wiretap were that when Lonnell Glover was out of drugs, Suggs was out of drugs. There were no interceptions that indicated that Suggs was receiving drugs or expected to receive drugs from anyone except Glover.[4]

21. To be sure, having come to believe that Suggs was attempting to get cocaine from Texas via Julian Johnson and got PCP from Lonnell Glover, the United States was justified in investigating further. Such investigation, however, should have been, and apparently <u>was,</u> conducted <u>through means other than the Suggs wiretap</u>. As the Court knows, the United States promptly obtained authorization for wiretaps on Glover's telephone and later his truck. Even later, they obtained a wiretap on Velma Williams' telephone. Likewise, the authorities in Texas began an investigation after a shipment allegedly accompanied by Johnson was intercepted. The government obtained the cooperation of a participant in that activity, and indeed, the United States later dismissed the instant case against Johnson specifically so that he could be tried for the offenses in Texas.

22. For the very same reasons the FBI asserts that its cooperating witnesses who allegedly purchased from Suggs would never be introduced to Suggs' suppliers, there is no reason to believe that Suggs, an allegedly local distributor, would gain access to

---

[4] In the third affidavit, Special Agent Pardee mentions a call between Suggs and Derrick Suggs, a cousin in Philadelphia, and postulates that Derrick is a possible supplier of cocaine to Suggs. Defendants completely fail to understand from the language of the call how the agents reached that conclusion. Suggs took trips out of town, such as to casinos, which were obviously recreational.

Glover's national connections or to the suppliers of the cocaine in Texas. Defendants assert that the Suggs wiretap should not have been extended simply to try and trace the suppliers of his suppliers.

23. Nor should the wiretap have been extended in order to try and discover additional customers of Suggs. At page 17 of the second affidavit, Special Agent Parde acknowledges that the investigation has identified the "regular" customers of Suggs. The agents apparently wanted authorization to try and determine "sporadic" customers of Suggs. Defendants assert that this is nothing more than a "fishing expedition," based upon speculation, there being no probable cause to believe that such calls would occur or that such persons would be identified.

C. Locations

24. The government sought to extend the wiretap in order to determine "(vi) the existence and location of apartments, residences, businesses and other premises used in the furtherance of the illegal activity," and "(viii) the existence and location of records of the illegal activity," which would presumably be the same places. It is difficult to see how the wiretap would provide much help in this regard as the persons speaking on the telephone presumably would already know where each other lived, worked, stayed or spent time. They would also presumably have meeting places arranged in advance.

25. On the other hand, the government had other, more reliable bases for determining locations. In addition to the obvious visual surveillance, the government received permission to put a tracking device on one of Suggs' vehicles. In addition, as the government acknowledges in the affidavit, telephone providers could provide the

locations for cellular telephone use without having to intercept the content of the calls. In short, the wiretap was a poor substitute for the other means of determining locations already available to the government.

D. Money

26. The government also sought to use the wiretap to determine "(vii) the methods of operation for laundering proceeds of illegal drug sales," "(ix) the existence, location and source of resources used to finance the illegal activity," and "(x) the existence, location and disposition of proceeds from the activity." Defendants are frankly puzzled by the need to learn the sources of resources to "finance the illegal activity;" the government's own investigation revealed that, as in most drug trafficking, Suggs would use the moneys paid him by customers to put together the money to buy new drugs when they were available.

27. As far as trying to locate proceeds or methods of money laundering, the initial wiretap revealed no information about these topics, and there was no reason to assume that further interceptions would reveal anything more. Moreover, the United States has available to it the ability to covertly obtain much more reliable information about Defendants financial condition, through bank records and other financial transactions. Again this wiretap could have been expected to reveal little of this information; and, given the absence of any specific allegations in the forfeiture count, it appears that no such financial evidence was ever produced.[5]

---

[5] The only specific allegation in the forfeiture count concerns the money found <u>during the execution of the March search warrant.</u>

IV. MINIMIZATION

A. General

28. Using the linesheets produced for the Suggs wiretap, Defendant Price was able to obtain a statistical analysis of the government's efforts to minimize "non-pertinent" conversations. [6] Attached to this Motion as an exhibit is a database listing all intercepted calls of two minutes or more;[7] where calls are reported as duplicates, the database includes them as one call, so as not to distort the figures. The database first lists non-pertinent calls that were not minimized, then non-pertinent calls that were minimized, then pertinent calls (some of which were minimized).[8]

29. The total number of calls, not counting duplicates, was 627, of which 197 were both non-pertinent and not minimized, 336 were non-pertinent but minimized, and 94 were pertinent calls. This was a ratio of 1 : 1.7 for non-minimized to minimized non-pertinent calls, meaning that for every non-pertinent call that was not minimized, the agents minimized only 1.7 calls. Defendants assert that given the promise of "immediate" minimization, this ratio demonstrates that, although the government did

---

[6] With one exception, the linesheets listed every call not determined to be pertinent as "unknown." This seems to Defendants to be an attempt to avoid responsibility for listing calls as non-pertinent, and Defendants treat the calls with the "unknown" classification as "non-pertinent." The one exception was a single call that had "privileged" as its classification.

[7] Although the application and orders all indicated that innocent calls would be immediately minimized, Defendant has used the commonly accepted threshold of two minutes as providing the monitoring agent with sufficient time to determine if a call is pertinent or not.

[8] Defendants are frankly puzzled by this decision. Defendants make no argument that any of these calls should have been minimized; regardless of whether they were, in fact, pertinent, the critical issue is whether the agents, at the time of the monitoring, thought they were pertinent. In any event, the minimization requirement is intended to minimize the recording of innocent conversations.

minimize many calls, they simply did not strenuously follow the Court's orders. Moreover when we look at the actual guidelines for carrying out the minimization, we see a further lack of strict compliance.

30. The operating procedures for the wiretap required monitoring agents, as they become more familiar with the calling patterns, to discern "patterns of innocence" for calls between the named interceptees and persons with whom their conversations are innocent in nature.[9] Likewise, monitoring agents are directed to be alert to developing further "patterns of involvement."

31. Even assuming that the agents needed some time initially to understand the targets' calling patterns, if the agents were actually evaluating calls to determine both patterns of innocence (and patterns of involvement), one would expect two things to happen. First, as the agents presumably improved their ability to identify as "pertinent" calls they might have been uncertain about earlier in the wiretap, the number of pertinent calls should rise. Secondly, a greater percentage of non-pertinent calls should be minimized over time, or put another way, the ratio of non-pertinent calls which were not minimized to those that were minimized should <u>continually increase</u> over the duration of the wiretap, as the agents should have been able to recognize some of the callers as uninvolved in the alleged criminal activity and more routinely minimized them. As the table below demonstrates, this simply did not happen.

---

[9] The operating procedures usually require that supplemental instructions will be provided as such patterns are developed. The United States has provided no examples of what "patterns of innocence" the agents developed in this case, nor any examples of supplemental instructions.

32. The following table breaks the wiretap data into 1000 session increments. Not only does the table show a dramatic drop in calls deemed pertinent, but, except for an initial bump, the table also shows that the ratio of non-minimized pertinent calls to minimized calls actually <u>decreased</u> on average, meaning that the agents were getting <u>worse</u>, not better, at minimizing non-pertinent calls.

| 1000 session increments | non-pertinent - <u>not</u> minimized | non-pertinent - minimized. | ratio | pertinent calls |
|---|---|---|---|---|
| 1-999 | 29 | 41 | 1 : 1.4 | 15 |
| 10001-1999 | 23 | 59 | 1 : 2.6 | 18 |
| 2000-2999 | 30 | 60 | 1 : 2.0 | 25 |
| 3000-3999 | 39 | 60 | 1 : 1.5 | 8 |
| 4000-4999 | 31 | 58 | 1: 1.9 | 1 |
| 5000-5999 | 28 | 40 | 1 : 1.4 | 6 |
| 6000-end | 17 | 18 | 1 : 1.1 | 0 |

33. The government may suggest that Defendants have failed to identify <u>individual</u> calls they thought should have been minimized. Defendants suggest that such a requirement is unnecessary since it is only a <u>pattern</u> of non-compliance which would warrant suppression of the wiretap. Given the apparent absence of substantial compliance with the government's own minimization procedures, Defendant respectfully suggests that at some point the burden shifts to the government to explain why the number of minimized calls did not continue to increase. Nonetheless, Defendant has also attached to this pleading, a <u>sample</u> of such calls which he claims should have been minimized.

B. Privileged Calls

34. The Court's authorizations directed the monitoring agent to give "special attention" to minimizing telephone calls that might implicate privileged

communications. One such area, specifically addressed at length in operating procedures, was communications involving lawyers.[10] Surprisingly, there were a number of calls involving Mr. Suggs which appear to be clearly covered by the attorney - client privilege. A list of such calls is also attached as an appendix to this Motion.

35. Defendant Price will leave it to Mr. Suggs to articulate any additional remedy he might seek should the Court agree that attorney - client communication were recorded. Defendants collectively assert that the failure to <u>completely</u> minimize any attorney - client communications is another factor which the Court may consider in finding that the government failed to comply with the minimization requirement, thus invalidating the entire wiretap.

WHEREFORE, for the above reasons, as well as those set forth in the attached Memorandum of Points and Authorities, Defendants respectfully request that this Court suppress all evidence against him arising from the electronic surveillance conducted by the Government on a telephone belonging to Anthony Suggs.

Respectfully submitted

/s/

Richard K. Gilbert
Bar. No. 939884
601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, D.C.  20004
(202) 898-0857

Attorney for Defendant Price

---

[10] Defendant Price is unaware of the precise legal relationship between Mr. Suggs and Ngozi Joy, thus does not address the potential issue of marital communications.

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA            :
                                                            :
                    v.                                     :                    Crim. No 07-152 (ESH)
                                                            :
ANTHONY M. SUGGS, *et al*                :


MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO SUPPRESS WIRETAP EVIDENCE


 I. STANDING

1. The Federal Wiretap Statute, enacted in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, is codified at 18 U.S.C. §§ 2520 through 2520. Section 2518 (10)(a), which authorizes "aggrieved persons" to move to suppress both the contents of the intercepted communications and the evidence derived therefrom, provides in pertinent part:

> Any aggrieved person in a trial, hearing, or proceeding before any court, department, officer, agency, regulatory body, or other subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that -
>
> (i)   the communication was unlawfully intercepted;
> (ii)  the order of authorization or approval under which it was intercepted is insufficient on its face; or
>          (iii) the interception was not made in conformity with the order of authorization or approval.

2. An "aggrieved person" includes a party or participant to the intercepted wire communications, as well as the person on whose premises the intercepted conversation occurred. *See, Alderman v. United States*, 394 U.S. 165, 174 (1969).  Defendant Price, and

the other defendants, were participants in numerous conversations on the Suggs wiretap. Thus, they, along with Defendant Suggs himself, are each an "aggrieved person" under 18 U.S.C. 2518 (10)(a), and each has standing to challenge the evidence from the wiretap.

## II. PROBABLE CAUSE, "NECESSITY" AND CONTINUING THE WIRETAPS

### A. General Considerations

3. The Fourth Amendment to the Constitution provides that "the right of people to be secure ...against unreasonable searches and seizures ...shall not be violated." The Supreme Court, in *Berger v. New York,* 388 U.S. 42 (1967), struck down a New York statute which provided for the issuance of a warrant for eavesdropping merely upon oath that there was reasonable grounds to believe that evidence of a crime may be obtained. In finding the statute violated the Fourth and Fourteenth Amendments to the United States Constitution, the Court observed that, "(t)he broad sweep of the statute is immediately observable and such a requirement raises a serious probable cause question under the Fourth Amendment." *Id*. at 54-55. The Court concluded that the New York statute constituted little more than a general warrant to seize any and all conversations of the named persons whose communications were to be intercepted and established. *See, Id*. Thus, because of these Fourth Amendment considerations, the probable cause bar for wiretap seizures of telephone conversations is a high one.

4. It is noteworthy that the Supreme Court has observed that in enacting Title III, Congress did not expect that electronic surveillance would be routinely used when traditional investigative techniques were sufficient to expose illegal activity. *See, United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). Perhaps it is archaic, but the use of electronic surveillance, it was once held, is allowed only in extraordinary circumstances. *See, Dalia v. United States*, 491 U.S. 238 (1979); *see also, United States v. Clerkley*, 556 F.2d 709 (4th Cir. 1973).

5. 18 U.S.C. Section 2516 (b) defines the probable cause standard as requiring a full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued including details as to the particular offense that has been, is being, or is about to be committed. 18 U.S.C. Section 2518(1)(c) goes further and requires that, in addition to the statement as to probable cause, each application for the wiretap must contain a full and complete statement as to whether or not other investigative procedures have been tried and failed, why they reasonably appear to be unlikely to succeed if tried, or why they are too dangerous. This is referred to as the "necessity" requirement.  The failure of the government's affidavit and application for an order to fully establish the requirements set forth in 18 U.S.C. Section 2518(1)(c) and 3(c) may, thus, also be a failure to establish probable cause for the wiretap. The requirement applies with equal force to extensions of wiretaps as to their initial authorization.

6. A mere boilerplate reiteration of difficulty of gathering usable evidence is not sufficient for authorizing electronic surveillance. *See, United States v. McKinney*,

785 F.Supp. 1214 (D.Md, 1992). Moreover, the application must affirmatively demonstrate normal investigative measures will not succeed or have not succeeded in the particular case at hand. *United States v. Robinson*, 698 F.2d 448 (D.C. Cir. 1983) (*per curium*). *Accord, United States v.* Blackmon, 273 F.3d 1204 (9th. Cir. 2001). *See also, United States v. Simpson*, 813 F.2d 1462 (9th. Cir. 1987); *cert. denied*, 484 U.S. 898 (1987) (facts withheld from authorizing judge revealed that traditional techniques could have led to successful infiltration of organization.)

7. Defendant Price does <u>not</u> raise a claim of lack of probable cause to <u>initially</u> conduct the wiretap as to Suggs. Nor does he claim that <u>initially</u> there was no "necessity" for the wiretap. Defendant makes this concession because of the government's stated desire to identify Suggs' suppliers and regular, wholesale customers, coupled with the inability to use other investigative means to do so. Probable cause and necessity are, however, both interrelated and subject to changing conditions. As set forth in the above Motion, Defendants contend that these primary objectives had been achieved and the additional "purposes" for conducting the wiretap were either without probable cause, other wise insufficient to warrant a w continued wiretap, and that normal investigative techniques could have sufficed to pursue the investigation. This is obviously a fact specific determination; *see, United States v. Carneiro,* 861 F.2d 1171 (9th Cir. 1988) (wiretap application satisfied necessity requirement as to one defendant, but not to two others.)

III. MINIMIZATION

8. In addition to the probable cause requirements, 18 U.S.C. § 2518(5) requires that even if a wiretap order is secured, such order shall contain a provision that the authorization to intercept shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter. The United States and the Court clearly recognized this legal obligation because the affidavits, applications and authorizations all specifically addressed the minimization requirement, as did the detailed operating procedures issued by the Office of the United States Attorney  to the agents for conducting the wiretap. The question, therefore is whether the agents complied.

9. Whether the government has complied with the minimization requirement is judged on a case-by-case basis, and the test for whether the government agents conducted the wiretap in accordance with the minimization requirement is one of "reasonableness," *Scott v. United States*, 936 U.S. 128, 139 (I978); *accord, United States v. Oriakhi*, 57 F.3d 1290, 1300 (4th Cir. 1995). The burden of proving that the executing agents complied with the statutory minimization requirement falls upon the government, *see, United States v. Rizzo*, 491 F.2d 215 (2d Cir. 1974); *cert. denied*, 416 U.S. 990 (1974). *Accord, United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990). However, courts have, in practice, required a defendant to demonstrate some *prima facie* showing that the government did not comply with the requirement, *United States v. Thornton*, 454 F.2d 957 (D. C. Cir. 1971).

10. Defendants sought to met this *prima facie* burden by demonstrating through data extracted from the government's own linesheets that there were a significant number of calls lasting over two minutes, sometimes <u>well</u> over two minutes, which were not deemed pertinent and which were not minimized. Defendants also produced samples, again taken from the government's own linesheets, of many such calls. Going beyond the raw totals, Defendants also demonstrated that the agents not only did not improve in their ability to identify and minimize non-pertinent calls as both common sense would expect and their specific operating procedures required, but arguably got <u>worse.</u> Finally, Defendants also demonstrated that the agents recorded, and in some cases even listened in their entirety to, calls between Defendant Suggs and his prospective or actual attorneys. For all of these reasons, Defendants submit that the agents did not comply with the minimization requirement and, therefore, evidence from the wiretap should be suppressed.

Respectfully submitted

/s/

Richard K. Gilbert
Bar. No. 939884
601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, D.C.  20004
(202) 898-0857

Attorney for Defendant Price
(Appointed By The Court)