UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | |
| v. : | Criminal No. 07-152 (ESH) |
| : | |
| ANTHONY MAURICE SUGGS, *et al.*, : | |
| Defendants. : | |

GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO
DEFENDANT'S JOINT MOTION TO SUPPRESS WIRETAP EVIDENCE

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits the following supplemental opposition to defendants' Joint Motion to Suppress Wiretap Evidence. At the status hearing on December 21, 2007 the Court directed the government to file any supplement to its opposition to Mr. Gilbert's various pleadings on behalf of the defendants regarding the suppression of the fruits of the court authorized wiretaps conducted during this investigation. The Court suggested that there were two areas which should be addressed by the government in any supplement to its previously filed opposition. First, the government should discuss the question of Judge Collyer's supervision of the government's conduct of the wiretap on defendant Suggs' telephone which Judge Collyer authorized. In that regard on December 7, 2007, the parties discussed in open court the government's proposal to supplement its earlier response with a redacted version of one of the several periodic reports submitted to Judge Collyer as required by her Orders in the wiretap and each of its two extensions. On December 20, 2007 we filed a redacted

version of the first periodic report[1] in its wiretap of Mr. Suggs' mobile cellular telephone. We shall further discuss Judge Collyer's supervision of interceptions in this matter briefly in the second part of this pleading.

Second, the Court directed the government's attention to the defendants' arguments with regard to the government's conduct of its duty to minimize interceptions in course of its monitoring of wire communications over Mr. Suggs' mobile cellular telephone. In their pleadings the defendants allege that the monitors failed in their responsibility to minimize 145[2] calls of over two minutes duration and on this basis the Court should suppress the fruits of this Court authorized wiretap.

*I. Factual Analysis*

Defendant sets out in their attachment the linesheets for 145 calls[3] which they submit comprise the total of non-minimized calls of a duration over two minutes. Given that there were 6478 activations over the course of monitoring in this wiretap, this means that assuming *arguendo* that each one of those calls represents a failure of minimization, the monitors failed to minimize

---

[1] Defendants' are correct in their several assumptions about the process and content of the periodic reports in the conduct of the monitoring of wire communications over Mr. Suggs' mobile cellular telephones. They are also correct in their assumption that Judge Collyer signed the reports as implied by the signature line in the redacted version.

[2] This sum represents our hand count of the activations in the attachment to defendants' December 18, 2007 Notice of Filing(hereinafter attachment). The attachment is headed "Linesheets for Non-minimized Calls" and is 111 pages in length. In the Notice of Filing defendants assert that the attachment lists "all of the calls over two minute [sic] in length which were neither deemed pertinent nor minimized."

[3] This number includes as well activation 6302, the conversation between Mr. Suggs and Mr. Ellis, Esquire, which the government has ordered the FBI to seal. Thegovernment intends no presentation of the recording except as ordered by this Court.

2.238 % of the total calls.  However, we do not agree that simply because a call is more than two minutes in length and <u>not</u> designated as pertinent that it follows *a fortiori* that the call therefore reflects a failure of minimization.  A more careful examination of the defendants claims of error is therefore required.

First, defendant fails to point out that while fourteen of those calls are over two minutes in length, they exceed two minutes by 10 seconds or less.  Defendants' does not acknowledge that 36 of those telephone calls over two minutes involve conversations between two targets of this investigation.[4]  Nor does he acknowledge that 16 of those calls occurred after January 28, 2007 and involve parties who have not been identified at the time of the interception.  Additionally, 28 of the calls they cite are from suspicious sources.[5]  Finally, defendants' analysis does not point out that 20 of the cited calls occur in the first ten days of monitoring and 15 more occur in the following ten days, that is within the first twenty days of monitoring.  These failures of defendant's analysis may overlap but when we apply only one of these failures to any given call we find that there are 17 calls in defendants' list which fall within the first ten days of monitoring and 61 calls thereafter which should be excepted from defendants' list for a total of 84 telephone calls.  There are thus only 67 calls out of a total of 6478 activations on this line during monitoring in which there is a basis to question the monitors performance and thus an "error" rate of 1.03 %.

---

[4] Indeed, one of the calls cited by defendants (activation 1083 on page 21 of their attachment) is less than two minutes (1:57 minutes) and is clearly a pertinent call in any event, let alone one in which monitors acted reasonably in listening as long as they did.

[5] We will discuss in detail, *infra,* what we mean by "suspicious sources" but for purposes of example, there are several telephone calls which were prisoner calls placed from some correctional facility.

*Suspicious Sources*

By the use of the term "suspicious sources" we describe the subset of telephone calls in the defendants' attachment which, by virtue of their origin, the other caller, or their content are of a type and character which would make a monitor reasonably concerned that the conversation may turn to narcotics or some other pertinent topic.

    a.    On January 12, 2007 at 10:42 p.m., monitors intercepted a telephone call between Mr. Suggs and an unknown male who was utilizing a telephone listed in the name of Stephanie Crump. The call lasted 2:07 minutes. This call, like the several below it involving Ms. Crump's telephone, is initially suspicious because there is a more than reasonable chance that it is between two parties who subscribe to their cellular telephones in the names of straw parties. The unknown male[6] spoke about "my man" and "somebody hit me," phrases common in the drug trafficking culture used to refer to a subjects drug supplier or a call from a drug purchasing customer. Given what was known about Suggs at this point, that is, confirmed participation in narcotics trafficking, and the early stage of the interceptions (day 4) when patterns of innocence and involvement are not yet evident, monitors were reasonable in listening to the call to determine the nature of "Bill's" relationship with Suggs.

    b.    On January 13, 2007 at 6:31 p.m., monitors intercepted a telephone call between Mr. Suggs and an unknown male identified as "Bam," who is believed to be John Watson. The call was placed from inside the Federal Correctional Institute at Petersburg, Virginia, where "Bam" is an inmate. The call lasted 3:34 minutes. Given what was known about Suggs at this point, the origin

---

[6] Suggs calls the unknown male Bill but he is not otherwise identified and therefore must be categorized as unknown.

of the call and the early stage of the interceptions (day 5) when patterns of innocence and involvement are not yet evident, monitors were reasonable in listening to the call to determine the nature of "Bam's" relationship with Suggs.

  c.  On January 14, 2007 at 6:02 p.m., monitors intercepted a telephone call between Mr. Suggs and an unknown male (it was not clear at this point if the unidentified male was "Bill") who was utilizing a telephone listed in the name of Stephanie Crump. Monitoring continued for 2:29 minutes until the call ended and during the call Suggs and the unidentified male discussed organizing parties for juveniles. Given that Suggs' only known business activity at this time was as a garbage man for the District of Columbia and a vendor of PCP and other narcotics, monitors were reasonable at this early stage in listening to the call to determine if this business scheme would impact or involve Suggs' illegal narcotics activity.

  d.  On January 19, 2007 at 10:27 p.m., monitors intercepted a telephone call between Mr. Suggs and James Gaston, a convicted heroin dealer also associated with Suggs' mother. The call lasted 3:56 minutes. Given what was known about Suggs at this point, the early stage of the interceptions (day 11) when patterns of innocence and involvement are not yet evident, and Gaston's narcotics history (he was only recently released from prison at this point), monitors were reasonable in listening to the call to determine the nature of the Gaston's relationship with Suggs.

  e.  On January 19, 2007 at 10:27 p.m., monitors intercepted a telephone call between Mr. Suggs and an unknown male identified (UM) using a telephone listed to Bruce Hardy and displaying a Philadelphia area code. The call lasted 6:44 minutes. During the call the UM spoke of "trying to get his man down there to do it real big," he discussed Julian "JuJu" Johnson, a co-defendant and named target in this investigation, and he discussed "Black," a person who it is believed is supplied

drugs by Suggs. Given what was known about Suggs at this point, the origin of the call, the matter discussed, and the early stage of the interceptions (day 11) when patterns of innocence and involvement are not yet evident, monitors were reasonable in listening to the call to determine the nature of the UM's relationship with Suggs. It should be noted as well given the content of this call, that there was no firm determination that Suggs had only one supplier or who that supplier was.

      f.      On January 22, 2007 at 5:09 p.m., monitors intercepted a telephone call between Mr. Suggs and James Gaston, a convicted heroin dealer also associated with Suggs' mother. See ¶ d, *supra.* The call lasted 2:13 minutes. Given what was known about Suggs at this point and Gaston's narcotics history, monitors were reasonable in listening to the call to determine the nature of the Gaston's relationship with Suggs.

      g.      On January 22, 2007 at 5:28 p.m., monitors intercepted a telephone call between Mr. Suggs and a UM. The call was placed from inside the a jail in North Carolina. The call lasted 6:30 minutes. Given what was known about Suggs at this point and the origin of the call monitors were reasonable in listening to the call to determine the nature of the UM's relationship with Suggs.

      h.      On January 22, 2007 at 9:10 p.m., monitors intercepted a telephone call between Mr. Suggs and a UM. The call was placed from inside the a jail in North Carolina and was from the same UM who called earlier that same day. The call lasted 4:40 minutes. Given what was known about Suggs at this point and the origin of the call monitors were reasonable in listening to the call to determine the nature of the UM's relationship with Suggs.

      i.      On January 26, 2007 at 2:39 p.m., monitors intercepted a telephone call between Mr. Suggs and a male caller addressed as "Greg" and believed to be a known narcotics trafficker named Greg Butler. The call lasted 2:08 minutes and during the call Butler and Suggs discussed a UM

6

named "Baldy" who was recently arrested. Given what was known about Suggs at this point and the identity of the caller and the topic under discussion, monitors were reasonable in listening to the call to determine the nature of the Butler's relationship with Suggs.

  j.  On February 4, 2007 at 9:26 p.m., monitors intercepted a telephone call between Mr. Suggs and his father, Carlton Hill. The vehicle driven by Suggs is registered in Hill's name. Suggs is obviously attempting to launder funds from his illegal trafficking by investing them in the vehicle but it was still a question as to whether Hill was an innocent third party or assisting Suggs in his laundering activity by permitting the vehicle to be registered in his name. During the conversation Suggs and Hill discussed signing some papers. The call lasted 2:09 minutes. Given what was known about Suggs at this point and the identity of the caller and the topic under discussion, monitors were reasonable in listening to the call to determine the nature of the Hill's relationship with Suggs and Suggs' automobile.

  k.  On February 8, 2007 at 3:03 p.m., monitors intercepted a telephone call between Mr. Suggs and James Gaston, a convicted heroin dealer also associated with Suggs' mother. The call lasted 3:27 minutes. Given what was known about Suggs at this point and Gaston's narcotics history, monitors were reasonable in listening to the call to determine the nature of the Gaston's relationship with Suggs.

  l.  On February 17, 2007 at 12:36 p.m., monitors intercepted a telephone call between Mr. Suggs and a UM Suggs referred to as "J." During the conversation Suggs and J discussed tickets including one ticket for "Fish," a nickname for Ernest Glover, one of Suggs' drug customers and a convicted PCP dealer co-defendant and target in this investigation. Agents and monitors in this investigation are aware that "ticket" is a common code word used by traffickers on the telephone to

7

disguise the fact that their conversation is actually about drugs. The call lasted 2:07 minutes. Given what was known about Suggs at this point and the use of a code word and the reference to a co-conspirator target, monitors were reasonable in listening to the call to determine the nature of the conversation.

      m.      On February 20, 2007 at 8:07 p.m., monitors intercepted a telephone call between Mr. Suggs and a UF who referred to herself as "Patricia." During the conversation Suggs and the UM discussed the fact that someone had asked Patricia to get them a telephone number for Suggs. Suggs responded by giving Patricia another number other than the target telephone number. During the conversation Suggs and the UM discussed defendant Glendale Lee and the fact that Lee would be out of a program by Friday. Suggs also stated with regard to the number he gave the UF that he was thinking of turning the target number off by Wednesday or Thursday. The call lasted 2:58 minutes. Given what was known about Suggs at this point, the reference to a co-conspirator target, and the discussion of a turning the target telephone off, monitors were reasonable in listening to the call to determine the nature of the UF's relationship with Suggs as well as to obtain relevant critical information about Suggs' plans for the target telephone.

      n.      On February 23, 2007 at 6:34 p.m., monitors intercepted a telephone call between Mr. Suggs and James Gaston, a convicted heroin dealer. The call lasted 4:27 minutes. Given what was known about Suggs at this point and Gaston's narcotics history, monitors were reasonable in listening to the call to determine the nature of the Gaston's relationship with Suggs.

      o.      On February 25, 2007 at 6:50 p.m., monitors intercepted a telephone call between Mr. Suggs and a UM identified as "J." During the conversation Suggs and the UM discussed the co-conspirator Glendale Lee who was to be out of a drug program by Friday but claims he will be going

to a second program at Second genesis. Suggs and the UM discussed that they believe that Lee is lying about what is going on. They are concerned that Lee is not calling them but rather only calls his girlfriend to report on his status. They discuss the girlfriend and state that "she ain't going to get any bank tonight because it is snowing," an apparent reference to the girl friend as a street drug trafficker. The call lasted 7:26 minutes. Given what was known about Suggs at this point, the reference to a co-conspirator target, Glendale Lee, and the nature of the discussion concerning Lee, monitors were reasonable in listening to the call to determine the nature of Suggs' and the UM's concern about Lee (were they co-conspiratorial and/or violent) and the nature of the UM's relationship with Suggs.

      p.      On February 25, 2007 at 9:35 p.m., monitors intercepted a telephone call between Mr. Suggs and a UM identified as "Greg." They discussed Ernest Glover and the incarcerated individual known as "Baldy." The call lasted 2:32 minutes. Given what was known about Suggs at this point, the reference to a co-conspirator target, Ernest Glover, and the incarcerated individual, monitors were reasonable in listening to the call to determine the nature of the UM's relationship with Suggs.

      q.      On March 1, 2007 at 12:24 p.m., monitors intercepted a telephone call between Mr. Suggs and Robert Waller. During the conversation Suggs and Waller discussed the co-conspirator Glendale Lee who left a Second Genesis drug program apparenmtly after a full term and was then transferred to a Second Genesis program in Anne Arundel County, Maryland. Suggs and Waller are both suspicious that Lee is not being truthful about his situation. The call lasted 2:34 minutes. Given what was known about Suggs at this point, the reference to a co-conspirator target, Glendale Lee, and the nature of the discussion concerning Lee, monitors were reasonable in listening to the call to determine the nature of Suggs' and Waller's concern about Lee.

r.   On March 2, 2007 at 7:21 p.m. monitors intercepted a call between Mr. Suggs and a person believed to be Suggs' cousin Kevin, an inmate at the Rivers Correctional Institute in Winton, North Carolina, a correctional facility which houses many prisoners from the metropolitan Washington area. During the conversation they discussed Glendale Lee, a co-conspirator, and his situation in drug treatment. The call lasted 9:23 minutes. Given what was known about Suggs at this point, the reference to a co-conspirator target, Glendale Lee, and the origin of the call from a correctional facility, monitors were reasonable in listening to the call.

s.   On March 3, 2007 at 2:56 p.m. monitors intercepted a call between Mr. Suggs and an unidentified female in which they discussed an incarcerated prisoner, identified only as Joe, and his progress toward release from incarceration. The call lasted 2:19 minutes. Given what was known about Suggs at this point, the reference to an incarcerated individual and the origin of the call from an unidentified female, monitors were reasonable in listening to the call.

t.   On March 5, 2007 at 5:38 p.m. monitors intercepted a call between Mr. Suggs and Irving York, 13701 Foal Ct, Upper Marlboro, Maryland, the individual in who's name the target telephone is subscribed and in who's name Suggs' prior telephone was subscribed. The target telephone is used exclusively by Suggs and it is therefore reasonable to believe that there is something relevant about the relationship between Suggs and York which would cause York to permit Suggs to subscribe to a telephone in York's name. The call lasted 2:09 minutes. Given what was known about Suggs at this point and the fact that he was in conversation with a man who was permitting Suggs to use his name to disguise his activity in narcotics trafficking, the monitors were reasonable in listening to the call.

  u. On March 12, 2007 at 9:07 p.m. monitors intercepted a call between Mr. Suggs and William Easter. Easter is an unindicted co-conspirator in this investigation whose residence was searched pursuant to a search warrant on June 19, 2007, with all the other warrants executed in connection with this investigation and prosecution. Easter gave Suggs directions to his location in a manner and form often encountered in this investigation leading up to a narcotics transaction. The call lasted 2:25 minutes. Given what was known about Suggs at this point and what was known about Easter, the monitors were reasonable in listening to the call.

  v. On March 16, 2007 at 8:32 p.m. monitors intercepted a call between Mr. Suggs and William Easter. See ¶ v, *supra.* Easter and Suggs had a general conversation which ended with Easter's promise to call Suggs when he gets into town. The call lasted 2:21 minutes. Given what was known about Suggs at this point and what was known about Easter, the monitors were reasonable in listening to the call.

  w. On March 18, 2007 at 5:33 p.m. monitors intercepted a call between Mr. Suggs and and his father in which Mr. Suggs gave his father directions to Julian "JuJu" Johnson's apartment at 3468 Andrews Court, apartment 203, Laurel, Maryland. This premises pursuant to a search warrant on June 19, 2007, with all the other warrants executed in connection with this investigation and prosecution and approximately $25,000 in cash was recovered. Prior to this call law enforcement did not know the location of the apartment. Given what was known about Suggs at this point and the fact that he was in conversation with a man who was possibly complicit in Suggs' efforts to disguise his narcotics trafficking activities and the fact that they were discussing directions to an apartment that was subsequently searched, monitors were reasonable in listening to this call.

    x. On March 22, 2007 at 6:50 p.m. monitors intercepted a call between Mr. Suggs and an individual named Phillip Beasley, also known as Black.  During the call Suggs and Beasley discussed the arrest in Takoma Park, Maryland, of another individual for narcotics trafficking. The call lasted 2:29 minutes.  Given what was known about Suggs at this point and the fact that he was in conversation with a man about the arrest  for narcotics trafficking of a man who was possibly a narcotics associate of Suggs, the monitors were reasonable in listening to the call.

    y. On March 29, 2007 at 2:21 p.m. monitors intercepted a call between Mr. Suggs and Robert Waller.  During the call Suggs and Waller discussed avoiding a particular neighborhood because it was "jump out day," a reference to police narcotics enforcement tactic, and they further discussed Glendale Lee.  See ¶ m, *supra*.  Given what was known about Suggs at this point and the fact that he was in conversation with a man about "jump out day" and a co-conspirator, the monitors were reasonable in listening to the call.

    z. On March 29, 2007 at 6:12 p.m. monitors intercepted a call between Mr. Suggs and "Bam," an incarcerated prisoner.  See ¶ b, *supra*.  During the call Suggs and "Bam" discussed "Scrap" and a number of other present and former associates of Suggs in narcotics trafficking.  The call lasted 4:01 minutes.  Given what was known about Suggs at this point, the several references to individuals involved in narcotics and the origin of the call from an incarcerated prisoner, monitors were reasonable in listening to the call.

    aa. On March 30, 2007 at 2:00 p.m. monitors intercepted a call between Mr. Suggs and Arthur M. Reynolds, Jr., a disbarred attorney with a long history of involvement in narcotics.  They discussed attorneys to represent Ms. Joy, Suggs' girlfriend and a co-conspirator in this case, including Mr. Jones and Mr. Ellis.  The call lasted 2:58 minutes.  Given what was known about

Suggs at this point, the identity of the other caller, the events of March 27, 2007 and Suggs' stated purpose for his efforts on behalf of Ms. Joy, monitors were reasonable in listening to the call.

bb.     On April 2, 2007 at 1:49 p.m. monitors intercepted a call between Mr. Suggs and "Bam," an incarcerated prisoner. See ¶¶ b and m, *supra*. During the call Suggs and "Bam" discussed Suggs sending money to "Bam." The call lasted 3:27 minutes. Given what was known about Suggs at this point and the origin of the call from an incarcerated prisoner, monitors were reasonable in listening to the call.

*Argument*

Defendants' assignment of error in the minimization procedures of the Federal Bureau of Investigation in the conduct of its monitoring of wire communications duly and properly authorized pursuant to 18 United States Code, § 2510, *et seq.*, Title III of the Omnibus Crime Bill of 1967. The seminal case with regard to the issue of minimization is *Scott v. United States,* 436 U.S. 128 (1978), a case which originated in this jurisdiction. In the opinion which was affirmed in the Supreme Court our Court of Appeals made clear that minimization is not a rigid process.

> Examination of the District Court's resolution of the merits discloses, however, that the court did apply an improper standard in assessing the agents' alleged noncompliance with the minimization requirement. As *James* and other cases make clear, any minimization determination requires an assessment of the reasonableness of the agents' efforts in light of the purpose of the wiretap and the information available to them at the time of interception. *See also United States v. Bynum*, 360 F.Supp. 400 (S.D.N.Y.), *aff'd*, 485 F.2d 490 (2d Cir. 1973), *vacated on other grounds* 417 U.S. 903, (1974); *United States v. Focarile*, 340 F.Supp. 1033 (D.Md.), *aff'd sub nom.United States v. Giordano*, 469 F.2d 522 (4th Cir. 1972), *aff'd,* 416 U.S. 505 (1974).

*United States v. Scott*, 504 F.2d 194, 198 (D.C. Cir. 1974). In short, here, as in every other question pertaining to law enforcement's performance with regard to matters of search and seizure, the watch word is reasonableness. The Court of Appeals pointed out that "a substantial number of the

13

intercepted conversations that cannot be classified as narcotics-related appear to have been either very short in duration or extremely ambiguous in nature, or both.  Interception of those conversations cannot be considered unreasonable, for the agents could not have determined whether they were innocent prior to their termination." *United States v. Scott, supra*, 504 F.2d at 198.  The matter was remanded with instructions to the District Court to "accept the call analysis and any other evidence that might appear to be of assistance in the resolution of this complicated minimization question.  And, after assuring itself of the validity of the evidentiary offerings, it should again assess the reasonableness of the agents' conduct . . . ." *United States v. Scott, supra*, 504 F.2d at 199.  On remand the District Court again suppressed the fruits of the wiretap "because of a failure to observe the statutory requirement for minimization of the interception of telephone, *United States v. Scott*, 516 F.2d 751, 753 (D.C. Cir. 1976), and the Court of Appeals reversed. The Court noted

> Before analyzing the most recent suppression order, a few general observations about the meaning of the minimization requirement are appropriate. The statute provides that all wiretaps "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception.  Since interceptions need only be minimized,." Congress quite clearly contemplated that some irrelevant conversations will inevitably be intercepted.  To hold that the monitoring agents must make a determination whether to minimize in the course of each individual conversation would be an open invitation to criminals to escape detection by the simple device of devoting the initial part of each call to non-criminal matters.  Thus the only feasible approach to minimization is the gradual development, during the execution of a particular wiretap order, of categories of calls which most likely will not produce information relevant to the investigation. . . .Where at least one party is a suspected participant in the criminal conduct, the agents will need to amass considerably more data before they can reasonably conclude that further interception will produce no relevant information. It is of course possible that conversations involving suspected conspirators will deal exclusively with topics other than the conspiracy, but it is unlikely that such conversations will be readily subject to

>   minimization.

*United States v. Scott*, *supra,* 516 F.2d at 754-55.  It should be remembered here that in *Scott* it was the government's position that the monitors had failed to minimize.  Even in light of this concession, the Court went on to say that

>   Since the extent of minimization required in a particular case can only be determined during the course of the wiretap, the District Court was clearly in error in asserting that the agents' behavior would be unreasonable under any circumstances. . . .The presence or absence of a good faith attempt to minimize on the part of the agents is undoubtedly one factor to be considered in assessing whether the minimization requirement has been satisfied, but the decision on the suppression motion must ultimately be based on the reasonableness of the actual interceptions and not on whether the agents subjectively intended to minimize their interceptions.

*Id*., at 756.

The Supreme Court in its review of *Scott II* affirmed our Court of Appeals' view.  "In view of the deterrent purposes of the exclusionary rule, consideration of official motives may play some part in determining whether application of the exclusionary rule is appropriate *after* a statutory or constitutional violation has been established.  But the existence *vel non* of such a violation turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time."  *Scott v. United States, supra,* 436 U.S. at 136.  The Supreme Court concluded by saying

>   We think the Government's position, which also served as the basis for decision in the Court of Appeals, embodies the proper approach for evaluating compliance with the minimization requirement. Although we have not examined this exact question at great length in any of our prior opinions, *almost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him.*  The language of the

>Amendment itself proscribes only "<u>unreasonable</u>" searches and seizures.

Id., at 137 (emphasis supplied).

In *United States v. Bennett*, 219 F.3d 1117 (9th Cir. 2000), the Ninth Circuit held that

>Even assuming the government improperly intercepted all 267 calls as the appellants assert, this was only 3.65% of the total number of calls intercepted. Such a percentage alone is not fatal. *See Homick*, 964 F.2d at 903 (noting that the interception of "even a relatively high percentage of nonpertinent calls is an inaccurate indicator of whether or not the government complied with the minimization requirement"). "Where, as here, the wire intercept concerns a drug ring, the need to allow latitude to monitoring agents is paramount.... The fact that the FBI overheard a few innocent conversations does not render its minimization efforts unreasonable." *Torres*, 908 F.2d at 1424 (citations omitted). In cases such as the present one involving "a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." *Scott*, 436 U.S. at 142, 98 S.Ct. 1717. Moreover, if phone conversations include guarded or coded language as in this case, a higher rate of nonrelevant intercepted calls should be expected because it takes longer to figure out the meaning of a particular call. *See id*. at 140, 98 S.Ct. 1717. We conclude that the interception of nonrelevant phone conversations were properly minimized.

*Id.,* at 1124. The Fifth Circuit uses a three part test in its determination if the government's performance of minimization is objectively reasonable in light of the circumstances confronting the monitor. The test considers (1) the nature and scope of the criminal enterprise under investigation; (2) the government's reasonable inferences of the character of a conversation from the parties to it; and (3) the extent of judicial supervision. *United States v. Brown*, 303 F.3d 582 (5th Cir. 2002). While such a test provides helpful guidance in assessing the government's performance regarding non-minimized calls, it clearly is premised upon a assessment of the reasonableness of the government's actions as mandated by the Supreme Court's opinion in *Scott.*

We submit that any reasonable assessment of the conduct of the monitors in this matter compels a conclusion that reasonable efforts were made to minimize the interception of non-pertinent irrelevant calls. Defendants' rigid view that any failure to minimize a call which lasts more than two minutes represents a failure of minimization is one that has been rejected by Circuit Courts nationwide. Where, as here, the target telephone is a cellular telephone used exclusively by a target of the investigation, monitors are compelled to closely view every conversation and decisions of minimization are affected by the monitors ability to identify the other party to the call. Such identifications are dependent upon things overheard in the conversation (Hey, Ju, howya doin'); by subscriber information or the lack thereof (male calling, female subscriber or unknown subscriber); by the point of origin of the call (another targets telephone or a correctional facility) and by other factors such as the topic or topics of the overheard conversation. With regard to the latter, certainly if the conversation involves drug dealing it is almost certainly pertinent. Our reference here is to conversations where the parties, one of whom is clearly for purposes of minimization, a target drug dealer, are discussing individuals involved in drug trafficking. We submit that under such circumstances it is clearly reasonable of a monitor to continue to listen. This is particularly true in monitoring in drug investigations where the relevant and pertinent portions of a conversation are extremely ephemeral and transitory and drug traffickers who use the telephone make conscious efforts to disguise their activity from law enforcement they fear may be monitoring their telephones.

Further, even if the government's minimization procedure were insufficient under § 2518(5), blanket suppression of all intercepted communications would be unwarranted. Title III authorizes suppression of "the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom," on only three grounds: "(i) the communication was unlawfully

17

intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 United States Code, § 2518(10)(a). It does not authorize suppression of properly intercepted communications on the ground that other communications were intercepted unlawfully. *United States v. Scott, supra*, 436 U.S. at 136 n.10 (acknowledging the government's argument that "§ 2518(10) requires suppression of only those conversations which were illegally intercepted, not suppression of all the intercepted conversations," but finding it unnecessary to reach the issue) Finally, even assuming a violation of minimization defendants' proposed remedy is unreasonable in the extreme. There is no possibility on this record that one can reasonably claim that here, as in *Scott,* law enforcement simply did not perform any minimization, Indeed, we submit that it is pre-eminently clear that monitors in this matter made strong efforts to minimize particularly when one considers that even defendants' grandest illusions in this regard result in a failure of minimization in only 2.238 % of the almost 6500 calls that were monitored in this case. The suggestion that on this basis all of the fruits of this wiretap should be suppressed flies in the face of the Supreme Court's opinion in *Scott* and those of our Court of Appeals in *Scott. See also United States v. Anderson*, 39 F.3d 331 (D.C. Cir. 1994). Such a radical approach has been consistently rejected by Circuits around the country. Total suppression is not an appropriate remedy. Total suppression of wiretap evidence "is not appropriate unless the moving party shows that there was a 'taint upon the investigation as a whole sufficient to warrant [such] sweeping relief.'" *United States v. Baltas*, 236 F.3d 27, 32 (1st Cir. 2001), and cases cited there. .

**WHEREFORE**, we respectfully submit that the defendants' Joint Motion to Suppress

Wiretap Evidence should be denied.

                    JEFFREY A. TAYLOR
                    UNITED STATES ATTORNEY

_____
WILLIAM J. O'MALLEY, JR.
Assistant United States Attorney

_____
ANTHONY SCARPELLI
Assistant United States Attorney

_____
JOHN K. HAN
Assistant United States Attorney

19

*Certificate of Service*

    **I HEREBY** certify that I have caused a copy of the foregoing government's Supplement to Its Opposition to defendants' Joint Motion to Suppress Wiretap Evidence to be served by mail upon counsel, for defendants as listed below; this 7th day of January, 2008.

                                                          WILLIAM J. O'MALLEY, JR.
                                                         Assistant United States Attorney
                                                         D. C. Bar No. 166-991
                                                         555 4th Street, N.W., Fourth Floor
                                                          Washington, D.C.  20001
                                                         (202) 305-1749

| | |
|---|---|
| **Anthony Maurice Suggs**<br>Patrick Donahue, Esquire<br>18 West Street<br>Annapolis, MD   21401 | **Glendale Earl Lee**<br>Frederick Jones<br>5901 Montrose Rd.,<br>Apt. 1009 North<br>Rockville, Maryland 20852 |
| **James Lawrence Parker**<br>James W. Rudasill, Jr.<br>601 Indiana Avenue, N.W. #500<br>Washington, D.C. 20004 | **Helery Price**<br>Richard K. Gilbert<br>601 Pennsylvania Avenue, N.W.<br>Suite 900, South Bldg.<br>Washington, D.C. 20001 |
| **Ernest Milton Glover**<br>Anthony Martin, Esquire<br>7841 Belle Point Drive<br>Greenbelt, Maryland, 20770 | |